Ernesto ESPINOZA, Plaintiff–Below, Appellant,

v.

HEWLETT–PACKARD COMPANY, Defendant–Below, Appellee.

No. 208, 2011.

Supreme Court of Delaware.

Submitted: Oct. 12, 2011.
Decided: Nov. 21, 2011.

---

Blake A. Bennett, Esquire, of Cooch & Taylor, P.A., Wilmington, Delaware; Of Counsel: Felipe J. Arroyo (argued) and Gregory E. Del Gaizo, Esquires, of Robbins Umeda LLP, San Diego, California; for Appellant.

Peter J. Walsh, Jr., Stephen C. Norman and R. Christian Walker, Esquires, of Potter Anderson & Corroon LLP, Wilmington, Delaware; Of Counsel: Steven M. Schatz (argued), Boris Feldman and Katherine L. Henderson, Esquires, of Wilson, Sonsini, Goodrich & Rosati, Palo Alto, California; Marc J. Sonnenfeld, Esquire, of Morgan, Lewis & Bockius LLP, Philadelphia, Pennsylvania; for Appellee.

Before STEELE, Chief Justice, BERGER, JACOBS and RIDGELY, Justices, and VAUGHN, President Judge,[1] constituting the Court en Banc.

JACOBS, Justice:

Ernesto Espinoza ("Espinoza"), the appellant and plaintiff-below, brought this action under 8 *Del. C.* § 220 to inspect certain books and records of the defendant-below appellee, Hewlett–Packard Company ("HP").[2] More specifically, Espinoza sought to inspect one document that HP refused voluntarily to disclose: an interim report (the "Covington Report" or the "Report") prepared by Covington & Burling, HP's outside counsel. The Covington Report was prepared in connection with an internal investigation into sexual harassment allegations made against HP's former Chief Executive Officer Mark V. Hurd ("Hurd"). The Court of Chancery held that Espinoza had not demonstrated a need to inspect the Covington Report sufficient to overcome the attorney-client privilege and work product immunity protections. On that basis that court denied Espinoza relief. We affirm, but on the alternative ground that Espinoza has not shown that the Covington Report is essential to his stated purpose, which is to investigate possible corporate wrongdoing.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Circumstances of Hurd's Departure from HP

HP is a Delaware corporation that sells computers, printers and other technology globally. HP's shares trade publicly on the New York Stock Exchange. Until he

---

**1.** Sitting by designation pursuant to Art. IV, § 12 of the Delaware Constitution and Supreme Court Rules 2 and 4.

**2.** 8 *Del. C.* § 220 pertinently provides:

Any stockholder ... shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose, and to make copies and extracts from:

a. The corporation's stock ledger, a list of its stockholders, and its other books and records. . . .

If the corporation ... refuses to permit an inspection sought by a stockholder ... the stockholder may apply to the Court of Chancery for an order to compel such inspection.

resigned on August 6, 2010, Hurd was HP's Board Chairman, President and CEO. Before that date, HP's board of directors (the "Board") consisted of Hurd and ten non-employee, outside directors.

On or about June 29, 2010, Hurd received a letter at his HP office from an employment lawyer, Gloria Allred, Esquire ("Ms. Allred").[3] In that letter Ms. Allred claimed that Hurd had sexually harassed her client, Jodie Fisher ("Fisher"), a former HP contractor, over the two-year period that Fisher performed work for the company. Ms. Allred's letter threatened legal action against both Hurd and HP, but it also suggested the possibility of reaching a confidential settlement.

Hurd promptly informed HP's General Counsel of the Allred letter. Thereafter, the HP Board began an internal investigation of Fisher's allegations. The Board retained Covington & Burling to conduct the inquiry and, based on that firm's findings, to advise the Board accordingly.[4] On July 28, 2010, the Board was presented with the Covington Report, which contained interim factual findings and analysis arising out of the Covington firm's investigation. One week later, on August 5, 2010, Hurd reached a confidential settlement with Fisher.

The following day, HP announced Hurd's departure from HP. In that announcement, the Board explained that although its internal investigation did not show that Hurd had committed sexual harassment, the investigation did reveal that Hurd had breached HP's Standards of Business Conduct. The announcement quoted Hurd as saying that, in light of those findings, "it would be difficult for me to continue as an effective leader at HP." In a conference call later that day, HP's General Counsel, Michael J. Holston, publicly reported further details of Hurd's misconduct. Mr. Holston stated that HP's internal probe revealed a "systematic pattern" of "inaccurate" expense reports that were intended to conceal Hurd's relationship with Fisher. The probe also revealed payments of HP funds "where there was not a legitimate business purpose."

The Board did not terminate Hurd "for cause." Instead, the Board approved a separation agreement under which Hurd received, among other benefits, severance payments estimated as worth over $30 million.[5]

### The Contents Of The Covington Report

According to HP, the Covington Report contained preliminary "findings and conclusions" regarding Fisher's allegations, and also "interim analysis and legal advice." HP has maintained throughout this proceeding that the Covington Report is protected by the attorney-client privilege and work product immunity doctrine.

HP also represented, to both the Court of Chancery and this Court, that the Covington Report does not discuss the issue that Espinoza is seeking to investigate in this action—whether the Board had grounds to terminate Hurd "for cause." Espinoza claims that if the Board had

---

3. The letter was dated June 24, 2010. HP stated that the company received the letter on June 29, 2010, without specifying whether that was also the date Hurd received it at his HP office.

4. Despite his position as a director, Hurd was excluded from the Board's deliberations concerning the internal investigation.

5. In its brief on appeal, HP emphasizes that "[i]n exchange," HP received "valuable consideration," such as: (i) Hurd's release of all claims against HP; (ii) amendments to Hurd's confidentiality agreement; (iii) a post-employment cooperation agreement; and (iv) Hurd's agreement "not to disparage HP, its affiliates, subsidiaries, officers or directors."

grounds to fire Hurd "for cause," then HP's multi-million dollar severance payments to Hurd should never have been paid. Based on HP's representation, the Court of Chancery found that the Covington Report "does not discuss the for-cause issue at all"[6]—a finding that Espinoza does not directly contest. We therefore rely on that finding as an undisputed fact for purposes of this appeal.

### Espinoza's Section 220 Demand

HP's announcement of Hurd's departure led to a flurry of shareholder derivative actions.[7] In response to a shareholder litigation demand, the company appointed a special committee of independent directors to consider whether to bring suit against the Board. That committee ultimately recommended that it was not in HP's best interests to pursue litigation.

On August 17, 2010, Espinoza's California counsel, Felipe J. Arroyo, Esquire, wrote a letter to HP on his client's behalf, demanding to inspect certain HP books and records relating to Hurd's resignation under 8 *Del. C.* § 220. The stated purpose of Espinoza's demand was:

> [To investigate] what appears from the public record to be improper conduct by certain officers and directors of HP concerning the resignation of Mr. Hurd....
>
> Despite Mr. Hurd's acute breaches of his fiduciary duty ... the Board voted unanimously to request his resignation and provide him with an extremely lucrative separation agreement....
>
> Mr. Espinoza has reason to believe that the Board's decision to agree to the Separation Agreement was in breach of the Board members' fiduciary duties and

amounted to waste of the Company's assets.

On September 2, 2010, HP's California counsel, Steven M. Schatz, Esquire, of Wilson Sonsini Goodrich & Rosati, responded in writing to Espinoza's Section 220 demand letter. Mr. Schatz disputed whether Espinoza had a credible basis for his claimed need to investigate HP's books and records, noting that "a number of derivative actions have already been filed" advancing similar allegations. Moreover, Mr. Schatz stated, even if Espinoza adequately stated a proper purpose, the scope of his demand was "overbroad" and sought "confidential and private information."

Despite having taken that position, HP nonetheless offered to provide (subject to a confidentiality agreement) extensive documentation relating to Hurd's departure. Those documents included Board meeting minutes, the Allred letter, expense reports, internal "conflict of interest" and expense reimbursement guidelines, and records of compensation provided to Fisher for "events, meals, and meetings with Mr. Hurd." HP refused to surrender the Covington Report, however, claiming that it was protected from disclosure under the attorney-client privilege and work product immunity doctrine.

### The Court of Chancery Section 220 Litigation

Espinoza accepted HP's proffered documents. On October 21, 2010, nonetheless, he formally made a second Section 220 demand, limited to one document—the Covington Report. After HP refused to produce the Report, Espinoza filed a Section 220 action in the Court of Chancery seeking a court-ordered inspection of that

---

6. Neither the Court of Chancery nor this Court has inspected the contents of the Covington Report *in camera.*

7. Nine lawsuits, in total, were filed in connection with Hurd's resignation, eight of which were filed in California, and the ninth in Delaware.

document. Espinoza's complaint alleged that he was entitled to relief because the Covington Report "uniquely detail[s] . . . the bases for the possible courses the Board evaluated and why it chose not to terminate Hurd for cause," and that "[t]his information is unavailable from any other source." Espinoza further claimed that that Report "contained the scope of the investigation, the investigative activities undertaken, findings of possible violations, and potential disciplinary options for HP."

HP defended on the basis that the Covington Report was privileged and immune from disclosure, and that Espinoza had failed to make the requisite showing to override those protections. In reply, Espinoza argued that under the *Garner v. Wolfinbarger*[8] analysis outlined by the Court of Chancery in *Grimes v. DSC Communications*,[9] a claim of attorney-client privilege would not preclude a Section 220 inspection of the Covington Report. Moreover, Espinoza claimed, his need for the Covington Report was sufficient to override a claim of work product immunity, as codified in Court of Chancery Rule 26(b)(3) and Delaware case law.

■ In a March 25, 2011 oral ruling, the Court of Chancery denied Espinoza's claim for relief, holding that Espinoza had not met his burden of demonstrating the requisite need to override either the attorney-client privilege or work product immunity. The Vice Chancellor held that the *Garner* factors did not favor Espinoza because he had not shown the Covington Report was "necessary" to his investigation. Moreover, Espinoza had not shown a "substantial" or "compelling" need for the Report, as required under applicable work product case law.[10] The Vice Chancellor stated: "[b]ecause I find that the interim report is protected by the attorney-client privilege and work product doctrine, it's not necessary for me to reach the [statutory] issue of whether it also would be necessary and essential to the plaintiff's stated purpose." The court stated that:

> As represented to the Court, [the Covington Report] does not contain the thought process of the board or any committee of the board in determining not to fire Hurd for cause. It might be helpful to the plaintiff in that it is something the board considered in making its decision, but this fact does not alter my conclusion that the report is not necessary to the plaintiff's investigation into the board's thought process in deciding not to fire Hurd for cause.

On that basis, the Court of Chancery granted judgment in favor of HP. Espinoza appeals from that judgment.

### *ANALYSIS*

Espinoza claims on appeal that the Court of Chancery erred as a matter of law in denying him inspection of the Covington Report. Although Espinoza does not dispute the applicability of the *Garner*-based analysis to his Section 220 demand, he challenges the conclusion the Court of

**8.** 430 F.2d 1093, 1103–04 (5th Cir.1970).

**9.** 724 A.2d 561, 568 (Del.Ch.1998). Among those factors are: (i) whether the claim is colorable; (ii) the necessity or desirability of the information and its availability from other sources; and (iii) the extent to which the information sought is specifically identified. *Id.* at 568.

**10.** A party seeking "nonopinion" work product must show: (i) a substantial need, and (ii) the inability to acquire a substantial equivalent. Del. Ch. Ct. Rule 26(b)(3). To discover "opinion" work product, the party seeking disclosure must show that (i) the material is directed to a pivotal issue; and (ii) the party's need for disclosure is compelling. *Tackett v. State Farm Fire & Cas. Insur. Co.*, 653 A.2d 254, 262 (Del.1995).

Chancery drew from that analysis: that he failed to make the showing required to override the protections of the attorney-client privilege and the work product immunity doctrine.

The crux of Espinoza's Section 220 claim is that the Covington Report "represents the central and only available evidence that shows what information the Board relied on in deciding not to terminate Hurd for 'cause.'" Therefore, it is "necessary to understand and evaluate the Board's deliberative process." Espinoza claims that the Covington Report is needed to provide necessary context to understand the information he already has, and that the Report contains details (relating to additional misconduct) not provided to him by HP. Therefore, Espinoza concludes, HP's claims of attorney-client privilege and work product immunity cannot trump his statutory inspection rights under Section 220.

■ This Court reviews a trial court's application of the attorney-client privilege and work product immunity doctrine *de novo*,[11] insofar as they involve questions of law.[12] And, we review a trial court's determination of the scope of relief available in a Section 220 books and records action for abuse of discretion.[13]

■ It is uncontested that, as a matter of law, Espinoza has stated a proper shareholder purpose under Section 220—to investigate possible wrongdoing. Nor is it contested that he has made the required factual showing of a credible basis to infer possible mismanagement.[14] To say it differently, Espinoza's entitlement to inspection relief is not at issue. But, that does not end the inquiry, because what remains in dispute is the scope of the relief to which Espinoza is entitled—specifically, whether he has established a right to inspect the Covington Report. The law applicable to that issue is well established. A shareholder who has discharged his burden of showing his entitlement to a Section 220 inspection must also satisfy an additional burden—to show that the specific books and records he seeks to inspect are "essential to [the] accomplishment of the stockholder's articulated purpose for the inspection."[15]

■ A document is "essential" for Section 220 purposes if, at a minimum, it addresses the crux of the shareholder's purpose,[16] and if the essential information the document contains is unavailable from

---

**11.** *Tackett*, 653 A.2d at 258 (citing *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 825 (Del.1992)).

**12.** *King v. VeriFone Holdings, Inc.*, 12 A.3d 1140, 1145 (Del.2011) ("We review a trial court's conclusions of law *de novo*.").

**13.** *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 569 (Del.1997).

**14.** *See City of Westland Police & Fire Ret. Sys. v. Axcelis Tech., Inc.*, 1 A.3d 281, 287–88 (Del.2010); *Seinfeld v. Verizon Comm., Inc.*, 909 A.2d 117, 121–25 (Del.2006).

**15.** *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del.1996).

**16.** *Compare Sec. First Corp.*, 687 A.2d at 569 ("The plaintiff bears the burden of proving that each category of books and records is *essential* to the accomplishment of the stockholder's articulated purpose for the inspection.") (emphasis added), *with* Del. Ch. Ct. R. 26(b)(1) ("Parties may obtain discovery regarding any matter, not privileged, that is *relevant* to the subject matter involved in the pending action.") (emphasis added). *See also, Grimes v. DSC Commc'ns Corp.*, 724 A.2d 561, 567 (Del.Ch.1998) ("I conclude that the plaintiff is not entitled to receive . . . other documents not *directly related* to [the committee's] . . . conclusions and recommendations unless he can articulate a reasonable need to inquire further. . . .") (emphasis added).

another source.[17] Whether or not a particular document is essential to a given inspection purpose is fact specific and will necessarily depend on the context in which the shareholder's inspection demand arises. In making that "scope of relief" determination, our courts must circumscribe orders granting inspection "with *rifled precision*." [18]

Espinoza's specific investigatory purpose is to "investigate why the Board paid tens of millions of dollars rather than dismiss [Hurd] for 'cause.'" Espinoza bears the burden of proving that the information contained in the Covington Report is essential to that purpose, taking into account the books and records HP has previously furnished.[19]

Espinoza's essentiality argument runs as follows: based on the "sanitized" Board minutes he has already been furnished, the Covington Report either contains a discussion of "potential disciplinary options" or "served as the basis for the Board's discussion of potential disciplinary options." In addition, the Covington Report would pinpoint which of Fisher's harassment allegations the Board was able to confirm, and

which of Hurd's expense reports and compensation records were falsified.

■ We conclude that Espinoza has not met his burden of showing the "essentiality" of the Covington Report, for three reasons. First, the Report itself does not discuss the "for cause" issue. Second, Espinoza has not shown, by a preponderance of the evidence, that the Covington Report was "central" to the Board's decision to enter into the separation agreement, rather than terminate Hurd for cause. Third, HP has already disclosed the information contained in the Covington Report that is essential to Espinoza's Section 220 stated purpose.

### 1. The Covington Report Does Not Discuss The "For Cause" Issue

■ If the Covington Report discussed the "for cause" termination issue, then Espinoza's claim would stand on a significantly different footing. But, as HP represented to both the Court of Chancery and this Court, the Covington Report contains no discussion or analysis of the "for cause" issue. No reason is shown to conclude otherwise.[20]

---

17. *See, e.g., Helmsman Management Serv. v. A & S Consultants, Inc.*, 525 A.2d 160, 168 (Del.Ch.1987) (denying demand for audited financial statements when no evidence presented other statements were inadequate to accomplish shareholder's purpose). *See also, Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 115 (Del.2002) ("[W]here a § 220 claim is based on alleged corporate wrongdoing ... the stockholder should be given *enough information* to effectively address the problem.") (emphasis added); *Thomas & Betts Corp.*, 681 A.2d at 1034–35 (limiting scope of inspection to documents essential to conducting valuation).

18. *Sec. First Corp.*, 687 A.2d at 570 (emphasis added).

19. To be sure, Espinoza is not required to identify the exact contents of the Covington Report before he has seen it. Rather, Espino-

za must show, by a preponderance of the evidence, that the Report is essential to the purpose of his inspection demand. *Sec. First Corp.*, 687 A.2d at 569. As a shareholder, Espinoza may use "documents, logic, testimony, or otherwise" to show a credible basis to infer wrongdoing, *id.* at 568, and to establish the "essentiality" of the demanded material, considering the impact of other disclosed materials.

20. In a dispute over the contents of the demanded materials, *in camera* inspection by the trial court may be appropriate to reach a decision. *See, e.g., Re: PharmAthene, Inc. v. SIGA Tech., Inc.*, 2009 WL 2031793 (Del.Ch. July 10, 2009) (discussing *in camera* review of documents claimed as privileged during discovery); *Dolphin Ltd. P'ship I, L.P. v. InfoUSA, Inc.*, 2006 WL 1071518 (Del.Ch. Apr. 11, 2006) (denying request to review certain doc-

### 2. Inadequate Showing That The Covington Report Was "Central" To The "For Cause" Decision

Espinoza next claims that the Covington Report played a "central" role in the Board's decision making process on the "for cause" issue. The record does not support that claim. It is conceivable that the Board consulted the Covington Report when it deliberated whether or not to terminate Hurd "for cause." Even if that were so, it is undisputed that the Report was not prepared for the purpose of the Board considering the "for cause" issue. Nor does it otherwise appear from the record what role, if any, the Report actually played in the Board's termination decision.

As the Court of Chancery observed, "[t]here were a number of other meetings of the HP board in the time period from July 28th up through August 6th or so, but there was no further report from Covington. And it's not clear that Covington was even involved in the later meetings." On the question of what impact the Covington Report played, the contrast between *Grimes* and this case is highly instructive. In *Grimes*, the report at issue played a potentially decisive role regarding the subject matter of that Section 220 action. That report contained the analysis and recommendation that specifically informed the board decision under investigation. In this case, the opposite is true. Here, there is no evidence that the Covington Report played any, let alone a "central," role in the Board's process in reaching the decision at issue here.

uments demanded in a Section 220 action after *in camera* review, on business strategy immunity grounds).

### 3. HP Disclosed The Essential Aspects Of The Covington Report

Finally, HP has previously furnished Espinoza with considerable documentation of the circumstances of Hurd's departure. Espinoza was informed of the precise details of Fisher's claims in Ms. Allred's letter to Hurd. Espinoza was also furnished records documenting much, if not all, of the misconduct that the Board's investigation uncovered and that the Covington Report chronicled. Those records also documented the internal investigation process (specifically, board minutes describing what materials were considered and when meetings took place). Espinoza was informed of the Covington Report's critical findings—namely, that Hurd violated HP's business conduct rules, but not its sexual harassment policy—and the Board's decision on "disciplinary options"—that Hurd resign from the company without being terminated "for cause." [21] These are the aspects of the Covington Report that address Espinoza's Section 220 purpose (to investigate the Board's "for cause" decision). None have been withheld from Espinoza.

HP has also provided some explanation of why the Board did not fire Hurd "for cause." As HP has described to this Court, the agreed upon terms of Hurd's "Separation Agreement and Release" were the result of a negotiation, with specific benefits received by HP "[i]n exchange." [22] Espinoza has made no showing that the undisclosed details contained in the Covington Report address the Board's negotiating position in arriving at that Agreement.

21. Hurd himself acknowledged that those violations made it "difficult . . . to continue as an effective leader at HP."

22. *See supra* note 5.

■ Because Espinoza has not shown that the Covington Report was essential to accomplishing his inspection purpose, the Court of Chancery acted well within its discretion in denying Section 220 relief. Having so concluded, we do not reach or address the separate question of whether inspection of the Report is precluded under the attorney-client privilege or the work product immunity doctrine. The "essentiality" inquiry should logically precede any privilege or work product inquiry, because the former inquiry is dispositive of a predicate question—the scope of inspection relief to which a plaintiff is entitled under Section 220.[23]

## CONCLUSION

For the above reasons, the judgment of the Court of Chancery is affirmed.

**23.** The Court of Chancery, in denying relief, appears to have taken the opposite approach. It held that it was unnecessary to determine whether the Covington Report was essential to Espinoza's stated purpose for seeking Section 220 inspection, because that document was protected under the attorney-client privilege and the work product immunity doctrine. We agree with the Vice Chancellor's implied determination that the analysis of essentiality is separate and distinct from an analysis of whether a document is protected by attorney-client privilege or work product immunity. An essentiality analysis is statutory, and is limited to actions to inspect corporate books and records under 8 *Del. C.* § 220. A privilege/work product analysis is a creature of common law, and applies to any document for which attorney-client privilege or work product immunity is claimed, and is not limited to Section 220 cases. But, in a Section 220 case the predicate issue is whether the books and records sought to be inspected are essential to the plaintiff's stated purpose. The Court of Chancery so recognized in *Grimes v. DSC Commc'ns Corp.*, 724 A.2d 561, 567–69 (Del.Ch.1998) (making the "scope" determination, then stating that "[t]he remaining issue is whether the plaintiff is entitled to production of the documents that the defendant asserts are privileged."). If the documents are not essential, then any privilege and work product issues become academic.