# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LOUIS E. BIZZARI, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 10709-JL |
| | ) | |
| v. | ) | |
| | ) | |
| SUBURBAN WASTE SERVICES, | ) | |
| INC., SUBURBAN WASTE | ) | |
| SERVICES OF DELAWARE, INC., | ) | |
| and FELT PROPERTIES, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

Submitted: May 16, 2016
Decided: August 30, 2016

## MEMORANDUM OPINION

William J. Rhodunda, Jr., Esquire and Nicholas G. Kondraschow, Esquire, RHODUNDA & WILLIAMS, LLC, Wilmington, Delaware; *Attorneys for Louis E. Bizzari.*

Sidney S. Liebesman, Esquire and Lisa Zwally Brown, Esquire, MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP, Wilmington, Delaware; *Attorneys for Suburban Waste Services, Inc., Suburban Waste Services of Delaware, Inc., and Felt Properties, LLC.*

**LeGROW, Judge**[1]

---

[1] Sitting as a Vice Chancellor by designation under Del. Const. art. IV, § 13(2).

This action involves a demand to inspect books and records of two Delaware entities. The inspection demand was made by an individual who owns a one-third interest in each entity and serves as a director or manager of the entities. The stated purposes of the inspection were to (1) value the plaintiff's interests in the entities, (2) investigate possible mismanagement and wrongdoing, and (3) fulfill the plaintiff's fiduciary duties to the entities. The entities resisted the demand on the basis that the plaintiff's true purpose was not his stated purposes or, alternatively, on the basis that the scope of the inspection sought was too broad.

Although the plaintiff, in his capacity as a stockholder and member of the entities, is entitled to a limited inspection of the entities' financial information, it is his right to inspect as a director and manager that is the challenging aspect of this case. Unquestionably, there is a strong presumption under Delaware law that a fiduciary is entitled to broad access to the books and records of the entity he serves. In this case, however, the defendant entities convincingly established that the plaintiff has engaged in efforts to compete with, and inflict reputational harm on, the entities. The plaintiff's actions in that regard largely were driven by his intense hatred of the entities' other two owners and principals. The complicated interpersonal relationship between the entities' three owners and principals, coupled with the plaintiff's familial relationship with one of the entities' main competitors, makes this case highly unusual and makes the prospect of the plaintiff

misusing the books and records both real and troubling.  The plaintiff's false testimony during trial in this matter further calls into question his willingness to abide by any order of this court limiting his use of the books and records.  In short, I conclude that the entities have carried their rather substantial burden of proving that the plaintiff's demand to inspect books and records in his capacity as a director and manager is not motivated by a proper purpose.  The relief the plaintiff seeks therefore largely is denied.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The parties

These are the facts as I find them after trial.  The plaintiff, Louis E. Bizzari, is the founder of the defendant companies, Suburban Waste Services of Delaware, Inc. ("Suburban Waste of DE") and Felt Properties, LLC ("Felt").[2]  Mr. Bizzari has been involved in waste management services for his entire career and is "third generation" in that industry.[3]  Felt operates as a holding company for properties owned by Suburban Waste of DE, but the distinction between the companies largely is formalistic, with all the day-to-day operations occurring at Suburban Waste of DE.[4]  Therefore, unless the distinction between the two is important, I

---

[2] Mr. Bizzari's complaint also sought inspection from Suburban Waste Services, Inc., a Pennsylvania corporation.  Mr. Bizzari voluntarily dismissed Suburban Waste Services, Inc. on September 3, 2015.
[3] Trial Transcript (hereinafter "Tr.") vol. I, 36.
[4] Tr. vol. I, 10, 113-14.

will refer to Suburban Waste of DE and Felt collectively throughout this opinion as "Suburban Waste."

## B. Suburban Waste's operations

For the first 13 years of Suburban Waste's existence, Mr. Bizzari managed the operations side of the business, while his wife, Christina Bizzari, managed the finances. Mr. Bizzari's approach to business operations was decidedly informal; neither he nor anyone else at the companies had an official title, Mr. Bizzari submitted bids on various projects by developing them "in his head" without utilizing a set formula or process, he paid employees under the table, and he relied on an uncertified accountant to prepare the companies' financial statements.[5]

Whether by reason of Mr. Bizzari's management style, the faltering economy, or otherwise, Suburban Waste lost money for several consecutive years leading up to 2013.[6] In that year, Mr. and Mrs. Bizzari added a new owner to the business, David DiIenno, who brought to the table both an infusion of cash and more than three decades of experience in the waste management business. In exchange for his buy-in, Mr. DiIenno received a 20% interest in each of Suburban Waste of DE and Felt, interests that later were increased to 33.33%.[7] As a result of

---

[5] *Id*. at 36-37, 41, 46-47.

[6] *Id*. at 38.

[7] JX 7-10. Mr. Bizzari disputes the validity of the Amended and Restated Stockholders Agreement and the Amended and Restated Limited Liability Company Agreement, which had the effect, among other things, of increasing Mr. DiIenno's ownership of Suburban Waste of DE and Felt. *See* JX 8, 10. That factual dispute is not germane to these proceedings. I assume for

3

that increase, Mr. Bizzari, Mrs. Bizzari, and Mr. DiIenno each owned one-third of Suburban Waste. In addition to each being directors of Suburban Waste of DE and managers of Felt, each owner received a newly minted title: Mr. DiIenno was named Chief Executive Officer of Suburban Waste, Mr. Bizzari was named Chief Operating Officer, and Mrs. Bizzari was named Chief Financial Officer.[8]

After he joined Suburban Waste, Mr. DiIenno set to work developing new procedures for Suburban Waste's operations, including budgeting and improving day-to-day operations, obtaining a workers' compensation policy, formalizing the bidding process, putting all employees on the payroll, and having Suburban Waste's accounts audited by a certified accountant, all of which Mr. Bizzari concedes were positive developments for Suburban Waste.[9] Mr. Bizzari's "volatile" temper, however, negatively impacted employee morale, particularly his repeated threats to quit and his negative comments regarding the companies and their future.

Solvency and financial stability are important in all businesses, but particularly are critical in the waste management industry because of the need to obtain bonding and credit facilities to sustain operations and bid on jobs. Mr.

---

the sake of this decision that the parties each own one-third of each company, but my ruling would not change if the ownership percentage was different.
[8] JX 7-10.
[9] Tr. vol. I, 38, 63, 90-91.

Bizzari and Mr. DiIenno agreed about that point at trial.[10] The true state of Suburban Waste's finances did not become apparent until after a certified accountant audited Suburban Waste's books. Faced with Suburban Waste's financial position and Mr. Bizzari's effect on employee morale, Mr. DiIenno became concerned that Mr. Bizzari's negative comments about Suburban Waste adversely could affect its reputation. That reputation, critical to Suburban Waste's continued operations, could be damaged by any rumored financial difficulties, which would spread quickly through the insular waste management community.[11]

### C. Mr. Bizzari takes a leave of absence.

In April 2014, Mr. Bizzari began a leave of absence from Suburban Waste occasioned by some medical issues he was confronting. At the suggestion of his physicians, Mr. Bizzari stepped away from Suburban Waste's day-to-day operations, leaving things in Mr. DiIenno's and Mrs. Bizzari's hands. Approximately four months later, Mr. Bizzari "reappeared" at Suburban Waste's offices without advanced warning. He quickly concluded, based on perceived reactions to his presence, that he was not wanted there.[12] Mr. Bizzari contends he was frozen out of Suburban Waste without explanation and that he stopped

---

[10] *Id*. at 47-48, 127, 138.
[11] *Id*. at 146-49, 154.
[12] *Id*. at 16.

receiving a paycheck in November 2014.[13] Mr. DiIenno tells a more nuanced story.

### D. Mr. Bizzari competes with Suburban Waste.

According to Mr. DiIenno, whose story I find credible, Mr. Bizzari ceased working at Suburban Waste in the fall of 2014,[14] having concluded he was not wanted at the offices. Shortly thereafter, Mr. Bizzari regularly was seen on the premises of his father's waste management company, B&L Hauling ("B&L"), which is Suburban Waste's direct competitor, often competing with Suburban Waste for municipal projects.[15] Mr. Bizzari's car frequently was parked at B&L's offices, and he was seen driving one of B&L's vehicles.[16] Mr. DiIenno also learned that Mr. Bizzari contacted one or more bonding companies on B&L's behalf to assist B&L in obtaining bonding. Mr. Bizzari concedes that he assisted his father in this way.[17] Mr. Bizzari also began soliciting Suburban Waste's long time employees to come work for B&L, a fact Mr. Bizzari denies but that credibly was confirmed by the testimony of two Suburban Waste employees who provided specific details regarding Mr. Bizzari's offer to them.[18] Finally, although he has no direct proof of such, Mr. DiIenno suspects Mr. Bizzari also may have called

---

[13] Pl.'s Opening Post-Trial Br. 2.
[14] Tr. vol. I, 154-55.
[15] *Id.* at 56-57, 170.
[16] Mr. Bizzari's denial of this fact was not credible. The same can be said for much of his testimony. *Id.* at 60, 166-70.
[17] *Id.* at 58-60.
[18] Tr. vol. II, 226-28, 237-38.

Suburban Waste's banks and credit agencies and suggested that Suburban Waste's demise was imminent.[19] Mr. Bizzari concedes he spoke with Suburban Waste's bankers during this period.[20]

It would seem counterintuitive for Mr. Bizzari to engage in conduct that competes with, and damages the reputation and productivity of, Suburban Waste. Mr. Bizzari's motive to do so, however, was strong; he discovered during this time period that Mrs. Bizzari and Mr. DiIenno were engaged in a romantic relationship.[21] When that relationship began is a disputed fact that need not be resolved for purposes of this action. What is important is that Mr. Bizzari believes the relationship began in 2013 and was concealed from him for more than a year.[22] He attributes the demise of his marriage with Mrs. Bizzari to her relationship with Mr. DiIenno. Mr. and Mrs. Bizzari are now, or were at the time of trial, engaged in a custody dispute regarding their minor children.[23] Mr. Bizzari's understandable anger about the relationship between his wife and his business partner was palpable at the time of trial. In contrast to that crumbling marital and business partnership, Mr. Bizzari's relationship with his father in the fall of 2014 was flourishing. Indeed, Mr. Bizzari acknowledged that, after years of estrangement,

---

[19] Tr. vol. I, 164-66.
[20] *Id*. at 68-69.
[21] *Id*. at 52-53, 191-92.
[22] *Id*. at 52-53.
[23] *Id*. at 55-56.

he and his father had re-established a relationship that was stronger than it ever had been.[24]

## E. The inspection demand

On January 13, 2015, Mr. Bizzari sent a letter to Suburban Waste of DE and Felt demanding inspection of those companies' books and records pursuant to 8 *Del. C.* § 220 and 6 *Del. C.* § 18-305 (the "Inspection Demand").[25] The Inspection Demand sought access to 25 categories of documents, which roughly can be divided into the following types of information: (1) information regarding the ownership and governance of the companies, namely the stock/member ledger, a statement of the value of property and services contributed by each stockholder or member to the companies, and charters, bylaws, stockholder agreements, operating agreements, and similar governing documents;[26] (2) financial information regarding each company, including both high-level documents, such as financial statements, balance sheets, and tax returns, as well as details and minutia such as compensation paid to every employee, all documents reflecting each operating, administrative, production sales, and all other expenses, credit, security, and pledge agreements, check registers, bank statements, cancelled checks, cash receipts, and

---

[24] *Id*. at 60.
[25] JX 11.
[26] *Id*. at Categories 1-2, 10, 25.

bank deposits;[27] and (3) documents relating to the actual or possible sale of company assets.[28]

> Mr. Bizzari indicated the purpose of the Inspection Demand was to:
>
> (i) monitor the performance of each Company, (ii) determine the value of [his] stockholder/member interest in each Company, and (iii) to [sic] investigate all claims, facts and circumstances relating to (a) the status of each Company's business, (b) each Company's financial condition, (c) each Company's financial activities, (d) the financial activities of each Company's stockholders/members taken on behalf of each Company, (e) wrongdoing, (f) improper transactions, (g) waste, and (h) mismanagement.[29]

The Inspection Demand did not specify what possible mismanagement, waste, or wrongdoing Mr. Bizzari believed might have been committed by or on behalf of Suburban Waste. When Suburban Waste did not permit Mr. Bizzari to inspect the requested books and records, he filed this action.

This case was not immediately expedited because the parties engaged in negotiations in an effort to resolve their dispute. When those negotiations broke down, Mr. Bizzari then filed a motion to expedite and a two-day trial was held in October 2015. The second day of trial was limited to the relatively brief testimony of two Suburban Waste employees whom Mr. Bizzari solicited to work for B&L. The parties then engaged in post-trial briefing and argument.

---

[27] *Id*. at Categories 3-9, 11-22.
[28] *Id*. at Categories 23, 24.
[29] *Id*. at 3.

## ANALYSIS

Mr. Bizzari demanded inspection of the books and records both in his capacities as a stockholder of Suburban Waste of DE and a member of Felt, as well as in his capacities as a director and a manager of those two companies, respectively. As the standard governing the Inspection Demand, as well as the possible scope of inspection, varies based on Mr. Bizzari's capacity, I analyze Mr. Bizzari's demand as a stockholder/member separately from his demand as a director/manager.

Mr. Bizzari contends he is entitled to inspect Suburban Waste's books and records in his capacity as a stockholder/member because he has stated two proper purposes for inspection: valuing his interest in Suburban Waste and investigating possible mismanagement or wrongdoing by Mr. DiIenno and Mrs. Bizzari.[30] Suburban Waste disputes the propriety of Mr. Bizzari's stated purposes, contending (i) he has not demonstrated a credible basis from which this Court may infer possible mismanagement or wrongdoing, and (ii) Mr. Bizzari's true purpose is to compete with, and inflict reputational harm on, Suburban Waste because of his personal animus toward Mr. DiIenno and Mrs. Bizzari.

Mr. Bizzari separately contends he is entitled to nearly unfettered access to Suburban Waste's books and records in his capacity as a director of Suburban

---

[30] Pl.'s Opening Post-Trial Br. 7-11.

Waste of DE and a manager of Felt. Suburban Waste resists that notion, contending that Mr. Bizzari's recent actions competing with the companies and attempting to damage their reputation in the community demonstrate that his stated purpose is not his true purpose and that he demanded inspection solely to gain access to Suburban Waste's confidential information with the aim of harming Suburban Waste.

I. **Mr. Bizzari is entitled to inspect high-level financial information for the purpose of valuing his shares, subject to a confidentiality order.**

Stockholders of Delaware corporations enjoy a qualified statutory right to inspect the corporation's stock ledger, a list of its stockholders, and its other books and records.[31] Members of a limited liability company similarly enjoy certain inspection rights under the Limited Liability Company Act (the "LLC Act"). The parties have not drawn any distinction between the rights Mr. Bizzari may enjoy as a stockholder of Suburban Waste of DE and the rights he may enjoy as a member of Felt, presumably because of the interconnected nature of the two businesses and because this Court treats Section 220, and the cases interpreting it, as the corporate analogue to inspection rights under Section 18-305 of the LLC Act.[32] I therefore will not draw any distinction in this opinion between Mr. Bizzari's inspection rights as a stockholder as opposed to his rights as a member.

---

[31] *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 116 (Del. 2002); 8 *Del. C.* § 220(b).
[32] *See, e.g. NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 421, n. 30 (Del. Ch. July 20, 2007).

11

A stockholder may inspect books and records if the demand complies with the form and manner requirements of the statute and the stockholder states a proper purpose for inspection. A stockholder's purpose is "proper" if it is "reasonably related to such person's interest as a stockholder" and is not adverse to the company.[33] When a stockholder seeks to inspect books and records other than a stocklist, the stockholder bears the burden of establishing that his primary purpose is proper.[34] If a stockholder carries that burden, any secondary purpose is considered irrelevant.[35] Any number of purposes may be proper, depending on the context of a particular case, but a stockholder's purpose must not be adverse to the company, unrelated to a legitimate interest of the stockholder, or intended to harass the corporation.[36] Here, Mr. Bizzari argues he has stated two proper purposes for inspection: (1) investigating possible mismanagement or wrongdoing, and (2) valuing his interest in Suburban Waste.

### A. Mr. Bizzari has not stated a proper purpose with respect to investigating possible waste, mismanagement, or wrongdoing.

Although investigation of corporate waste, mismanagement, or wrongdoing is a proper purpose for which to demand inspection of books and records,[37] the

---

[33] 8 *Del. C.* § 220(b); *CM & M Grp., Inc. v. Carroll*, 453 A.2d 788, 792 (Del. 1982).
[34] *Beiser v. PMC-Sierra, Inc.*, 2009 WL 483321, at *2 (Del. Ch. Feb. 26, 2009).
[35] *Norfolk Cty. Ret. Sys. v. Jos. A. Bank Clothiers, Inc.*, 2009 WL 353746, at *5 (Del. Ch. Feb. 12, 2009); *BBC Acq. Corp. v. Durr-Fillauer Med., Inc.*, 623 A.2d 85, 88 (Del. Ch. 1992).
[36] *CM & M Grp., Inc.*, 453 A.2d at 792.
[37] *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 567 (Del. 1997); *Dobler v. Montgomery Cellular Hldg. Co.*, 2001 WL 1334182, at *3 (Del. Ch. Oct. 19, 2001).

simple invocation of the phrase "mismanagement and wrongdoing" is not sufficient to obtain access to corporate books. Mere suspicion, or a subjective belief of wrongdoing, without more, is not enough to state a proper purpose.[38] Instead, a stockholder whose stated purpose is investigation of mismanagement must provide "some evidence" to suggest a "credible basis" from which this Court may infer "possible" mismanagement, waste, or wrongdoing have occurred.[39]

This credible basis standard has been described as the "lowest possible burden of proof" under Delaware law.[40] The standard falls far short of requiring a stockholder to prove by a preponderance of the evidence that mismanagement or wrongdoing actually has occurred.[41] The burden is not insubstantial, however, as it is designed to strike a balance between granting stockholders access to corporate records and protecting corporations and their stockholders from wasteful fishing expeditions based entirely on curiosity.[42]

Mr. Bizzari alleges he has met the credible basis standard by introducing evidence that: (1) Mr. DiIenno and Mrs. Bizzari sought to remove him from his positions as director and manager in contravention of Suburban Waste's governing documents, (2) Mr. DiIenno and Mrs. Bizzari sold or negotiated a potential sale of

---

[38] *City of Westland Police & Fire Ret. Sys. v. Axcelis Techs., Inc.,* 1 A.3d 281, 287 (Del. 2010); *Marathon P'rs, L.P. v. M&F Worldwide Corp.*, 2004 WL 1728604, at *5 (July 30, 2004).
[39] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 118 (Del. 2006).
[40] *La. Mun. Police Emp. Ret. Sys. v. Countrywide Fin. Corp.*, 2007 WL 2896540, at *10.
[41] *Axcelis Techs., Inc.*, 1 A.3d at 287; *Countrywide Fin. Corp.*, 2007 WL 2896540, at *10.
[42] *Seinfeld*, 909 A.2d at 118.

one or more of Suburban Waste's properties, even though a sale of such assets requires Mr. Bizzari's consent, and (3) Mr. DiIenno and Mrs. Bizzari may be mishandling Suburban Waste's finances because its accounts payable have increased substantially in the last year.[43] Shortly after trial in this inspection action, Mr. Bizzari filed an action against Mr. DiIenno and Mrs. Bizzari for breach of fiduciary duty associated with the efforts to remove him as a director and manager and the efforts to sell certain Suburban Waste assets without his consent. That action (the "Plenary Action") remains pending in this Court.[44] The defendants in the Plenary Action have answered that complaint and discovery presumably will proceed in the ordinary course.

By filing the Plenary Action, Mr. Bizzari effectively conceded that the books and records he seeks are not necessary or essential to his stated purpose of investigating mismanagement or wrongdoing with respect to the removal or asset sale issues.[45] Mr. Bizzari and his counsel presumably concluded they possessed sufficient information under Rule 11 to file the complaint without first inspecting

---

[43] Pl.'s Opening Post-Trial Br. 11-12.

[44] *Bizzari v. DiIenno*, C.A. No. 12109-VCG.

[45] *See King v. Verifone Hldgs., Inc.*, 12 A.3d 1140, 1150 (Del. 2011) (holding dismissal of an inspection action is proper when the stockholder's plenary complaint is still pending and the court in which the plenary action was filed has not granted leave to amend); *Cent. Laborers Pension Fund v. News Corp.*, 2011 WL 6224538, at *1 (Del. Ch. Nov. 30, 2011) (acknowledging as a general rule that a books and records action to investigate mismanagement or wrongdoing cannot be maintained simultaneously with a derivative action relating to the same alleged mismanagement or wrongdoing); *Baca v. Insight Enters., Inc.*, 2010 WL 2219715, at *4 (Del. Ch. Jun. 3, 2010) (holding the filing of a derivative complaint is inconsistent with a stockholder's representation that inspection is necessary to investigate possible mismanagement or wrongdoing).

14

books and records. As no motion to dismiss has been filed challenging the sufficiency of the allegations, Mr. Bizzari can complete any additional "investigation" under the much broader discovery that will be available to him under the Court's rules. The availability of discovery in the Plenary Action undercuts Mr. Bizzari's alleged need to investigate mismanagement through an inspection demand.[46]

As to the remaining allegation, I cannot conclude that an increase in Suburban Waste's accounts payable, standing alone, amounts to evidence from which the Court may infer possible mismanagement or wrongdoing. Mr. Bizzari argues this figure indicates Suburban Waste must not be paying its bills in a timely manner. Without any other evidence suggesting Suburban Waste is not paying its bills when they come due, the mere indication that expenses have increased is not evidence from which mismanagement or wrongdoing may be inferred.

For those reasons, I conclude Mr. Bizzari failed to meet his burden of establishing a credible basis to investigate possible mismanagement or wrongdoing.

---

[46] *Cent. Laborers Pension Fund*, 2011 WL 6224538, at *2, n. 11 ("In *Verifone*, the Supreme Court concluded that the opportunity given to the shareholder to amend the complaint in the derivative action in the face of dismissal satisfied the statutory proper purpose standard. In contrast, it is the proper purpose standard that limits [plaintiff] in [this] 220 Action. Until its implicit representation that it has sufficient facts for its pleadings in the Derivative Action is rejected (or, perhaps, seriously called into question) by the Court handling the Derivative Action, it simply cannot identify that proper purpose that is consistent with the statutory standard.").

**B. Mr. Bizzari is entitled to inspect high-level financial information for the purpose of valuing his interest in Suburban Waste.**

Mr. Bizzari also contends he is entitled to inspect Suburban Waste's books and records in order to value his interests in Suburban Waste of DE and Felt. The valuation of a stockholder's interest is a valid purpose to inspect books and records.[47] Because minority stockholders of privately held corporations "do not receive the mandated, periodic disclosures associated with a publicly held corporation, [those stockholders] face certain unique risks."[48] Minority stockholders in private corporations may "have a legitimate need to inspect the corporation's books and records to value their investment, in order to decide whether to buy additional shares, sell their shares, or take some other action to protect their investment."[49]

Suburban Waste concedes that Mr. Bizzari's valuation purpose is a proper one and that he is entitled to inspect books and records "that would enable him to value his shares."[50] Suburban Waste contends, however, that the bulk of the records Mr. Bizzari seeks are not necessary to satisfy that purpose. A stockholder who states a proper purpose for inspection is entitled to inspect only those records

---

[47] *CM & M Grp., Inc.*, 453 A.2d at 792.

[48] *Thomas & Betts Corp. v. Leviton Mrg. Co.*, 685 A.2d 702, 713 (Del. Ch. 1995).

[49] *Id.*; *see also Macklowe v. Planet Hollywood, Inc.*, 1994 WL 560804, at *4 (Del. Ch. Sept. 29, 1994) ("When a minority shareholder in a closely held corporation whose stock is not publicly traded needs to value his or her shares in order to decide whether to sell them, normally the only way to accomplish that is by examining the appropriate corporate books and records.").

[50] Pl.'s Opening Post-Trial Br. 17.

16

that are "essential and sufficient" to achieve his purpose.[51] A document is "essential" under Section 220 if "it addresses the crux of the shareholder's purpose," and the "information the document contains is unavailable from another source."[52] Put another way, a stockholder seeking to inspect books and records must specifically and discretely identify, with "rifled precision," the documents sought.[53] This inquiry necessarily depends on the context of each case.[54]

As I read the Inspection Demand, categories 3-24 relate to Mr. Bizzari's valuation purpose. The bulk of those categories seek line-item details that are reflected or incorporated in the company's financial statements and therefore need not separately be provided in order for Mr. Bizzari or his accountant to obtain an accurate valuation of Mr. Bizzari's interest. Mr. Bizzari established that the requests for the following categories of books and records were necessary and essential to valuing his interests: (i) financial statements, income statements, balance sheets, and communications from accountants,[55] (ii) tax returns and schedules thereto,[56] (iii) agreements encumbering Suburban Waste's assets,[57] and (iv) documents concerning the actual or possible acquisition of any stockholder's or member's interest in Suburban Waste of DE or Felt.

[51] *Macklowe*, 1994 WL 560804, at *6; *see* 8 *Del. C.* § 220(c).
[52] *Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 371-72 (Del. 2011) (citations omitted).
[53] *Sec. First Corp.*, 687 A.2d at 570.
[54] *Espinoza*, 32 A.3d at 372.
[55] JX 11, Category 3.
[56] *Id.* at Category 5.
[57] *Id.* at Category 15.

17

The remaining requests seek granular detail for which Mr. Bizzari could not articulate any need. When asked to explain what he needs to value his shares, Mr. Bizzari offered nothing more specific than "[e]verything that I asked for." Mr. Bizzari did not explain how requests for all compensation paid to employees, monthly cash flow statements, all sales and expenses, credit, security, and pledge agreements, schedules of accounts payable and accounts receivable, check registers, and bank statements would aid in valuing his interests beyond the aggregate information contained in Suburban Waste's financial statements. It is a stockholder's burden to prove each category of documents is essential to his purpose.

Even if the question was a close one regarding Mr. Bizzari's need for this detailed information, the evidence of Mr. Bizzari's conflicting motives and past conduct in competing with Suburban Waste leaves me firmly convinced that he is not seeking that information for valuation purposes, but rather to obtain a detailed view of Suburban Waste's finances, vendors, clients, and creditors, all of which Mr. Bizzari could use to further his vendetta against Mr. DiIenno and Mrs. Bizzari. In defining the scope of an inspection, this Court may consider any ulterior motives of the stockholder demanding inspection.[58] In my view, and as explained

---

[58] *Helmsman Mgmt. Servs., Inc. v. A & S Consultants, Inc.*, 525 A.2d 160, 167 (Del. Ch. 1987).

18

in greater detail below, Mr. Bizzari's ulterior motives counsel against any finding that the detailed financial information he seeks is essential to his valuation purpose.

In addition, and for those same reasons, any inspection necessarily will be predicated on Mr. Bizzari's agreement to abide by a confidentiality order entered by this Court. The parties are instructed to negotiate the terms of such an order and to file a proposed order with the Court within ten days of the date of this opinion.

## II. Mr. Bizzari's motives for inspecting the remaining books and records are not reasonably related to his position as a director or manager.

Independent of his rights as a stockholder and member of Suburban Waste of DE and Felt, Mr. Bizzari also maintains he is entitled broadly to inspect Suburban Waste's books and records by virtue of his position as a director of Suburban Waste of DE and a manager of Felt. Mr. Bizzari contends, correctly, that Suburban Waste bears the burden of establishing that his motives in seeking inspection are improper, and contends, incorrectly in my view, that Suburban Waste has not carried its burden in this regard. Suburban Waste, on the other hand, urges that the evidence at trial demonstrated that Mr. Bizzari's motives are inconsistent with his fiduciary obligations and with the interests of Suburban Waste and its stockholders. Having considered the evidence at trial and observed the witnesses' credibility, I agree with Suburban Waste.

19

I reach that conclusion with due regard for the fact that there is a strong presumption under Delaware law that a director of a corporation is entitled to "essentially unfettered" access to the books and records of the corporation of which he is a fiduciary.[59] The public policy underlying that rule is plain: a director charged with fiduciary obligations to protect and preserve a corporation must have access to the corporation's books and records if he reasonably can be expected to perform his duties.[60] For that reason, a director seeking inspection of books and records "makes out a *prima facie* case when he shows that he is a director, he has demanded inspection and his demand has been refused."[61] A corporation resisting such inspection bears the burden of proving that the director does not have a proper purpose for the requested inspection.[62] The number of cases in which this Court has concluded a director's purpose was not proper is predictably small. This case qualifies as one of the rare exceptions to this Court's general reluctance to conclude that a fiduciary's presumed right to access books and records has been rebutted.

During trial, Suburban Waste demonstrated, not only through the testimony of Mr. DiIenno and the two Suburban Waste employees whom Mr. Bizzari

---

[59] *Milstein v. DEC Ins. Brokerage Corp.*, C.A. Nos. 17586 and 17587 (Del. Ch. Feb. 1, 2000) (TRANSCRIPT) (bench ruling quoted in *Schoon v. Troy Corp.*, 2006 WL 1851481, at *1, n.8 (Del. Ch. Jun. 27, 2006)).

[60] *Holdgreiwe v. Nostalgia Network, Inc.*, 1993 WL 144604, at *3 (Del. Ch. Apr. 29, 1993).

[61] *Henshaw v. Am. Cement Corp.*, 252 A.2d 125, 129 (Del. Ch. 1969).

[62] *Holdgreiwe*, 1993 WL 144604, at *3.

solicited to work at B&L, but also through Mr. Bizzari's own admissions, that Mr. Bizzari's conduct during the last year had been entirely inconsistent with Suburban Waste's interests. For example, Mr. Bizzari's allusions to employees or banks about financial difficulties or improprieties at Suburban Waste likely have damaged Suburban Waste's reputation in a way that is difficult to quantify, let alone rectify. He directly worked with Suburban Waste's competitor, B&L, by assisting B&L with bonding, driving B&L's trucks, and attempting to poach some of Suburban Waste's long-time employees. Suburban Waste also effectively demonstrated that, although damaging Suburban Waste's reputation and operations may be inconsistent with his financial interests, Mr. Bizzari has allowed his emotional distress over the relationship between Mr. DiIenno and Mrs. Bizzari to cloud his judgment.

Because, in the past, Mr. Bizzari has demonstrated a willingness to compete directly with Suburban Waste by assisting B&L, and because he remains motivated to do so as a result of his extreme anger and resentment of Suburban Waste's other two principals, to say nothing of his ongoing divorce and custody dispute with Mrs. Bizzari, I conclude Mr. Bizzari demanded the inspection to either (1) further his efforts to damage Suburban Waste or (2) hold Suburban Waste hostage in order to effectuate a desirable settlement of the parties' larger disputes regarding the companies' future. Either way, he did not demand the inspection in order to carry

out his fiduciary obligations to the companies. In my view, permitting the inspection would enable Mr. Bizzari to breach his fiduciary duties, not uphold them.

Mr. Bizzari vigorously resists any implication that he has acted or might act in a manner injurious to Suburban Waste's reputation or its financial security. He was not, however, an effective witness on his own behalf. Mr. Bizzari admitted he has violated the law in the past by paying employees "under the table." He conceded that he called upon relationships he developed at Suburban Waste to assist B&L in its efforts to obtain new bonding.[63] He denied, unconvincingly, contacting Suburban Waste's employees about coming to work at B&L, but that testimony was contradicted by the detailed and credible testimony of two of the employees. In addition, Mr. Bizzari's own testimony regarding his thriving relationship with his father after years of estrangement, compared to his visible contempt for Mr. DiIenno and Mrs. Bizzari, leaves little question regarding where his loyalties and interests lie. Suburban Waste therefore has carried its burden in proving that Mr. Bizzari's purpose for seeking access to Suburban Waste's books and records, other than its high-level financial information, is not reasonably related to his interests as a director or manager.

---

[63] Tr. vol. I, 58-60.

Notable in its absence at trial or in post-trial briefing was any effort by Mr. Bizzari to assuage concerns about his motives by indicating a willingness to sign a tightly-worded (or, indeed, any) confidentiality agreement or offer his interest in Suburban Waste as collateral for his guarantee not to misuse the books and records were he permitted to inspect them. Nor did Mr. Bizzari offer testimony of anyone at B&L to corroborate his denial of Suburban Waste's accusations. His failure effectively to rebut Suburban Waste's evidence, and his refusal to acknowledge and attempt to ameliorate the concerns about his motives only further draws into question his intended purpose.

### III. Mr. Bizzari's false testimony is not sufficient to bar the limited relief to which he otherwise is entitled.

Although the argument largely is mooted by my conclusion that Mr. Bizzari is entitled to inspect only a small portion of the books and records he demanded, I nevertheless briefly will address Suburban Waste's contention that Mr. Bizzari's conduct during the course of this litigation bars him from obtaining the relief he seeks. Suburban Waste argues that Mr. Bizzari perjured himself regarding his efforts to solicit Suburban Waste's employees and that this false testimony "undermines the integrity of the judicial process."[64] Suburban Waste urges that Mr. Bizzari's request for inspection should be denied on that basis and that the case

---

[64] Defs.' Answering Br. 27.

should be dismissed under Court of Chancery Rule 41(b).[65] Suburban Waste reasons that it would send a poor signal to potential witnesses were there no consequence to providing false testimony to the Court.[66]

Far from the absence of consequences, however, the most natural consequence for false testimony is for the trial court to conclude that the witness is not credible. That is not to say that other consequences may not be appropriate or warranted in a particular case. Here, however, the consequence of my conclusion that Mr. Bizzari's testimony was not credible is the follow-on conclusion that he is not entitled to the vast majority of the relief he seeks. In this case, no additional sanction is warranted.

## CONCLUSION

For the foregoing reasons, Mr. Bizzari is entitled to inspect the limited categories of documents referenced in Section I. (B.) of this Opinion, subject to an appropriate confidentiality order. Suburban Waste **SHALL** prepare a proposed form of order conforming to this Opinion, including appropriate confidentiality restrictions, and **SHALL** file it with the Court within **TEN DAYS** of the date of this Opinion. Before filing the proposed form of order, the parties **SHALL** exchange drafts and **SHALL** confer regarding any disputed terms in the order. Any dispute regarding the terms of the proposed order may not be raised to the

---

[65] *Id*. at 30.
[66] *Id*.

Court unless or until the parties have met and conferred, in person, regarding the dispute.  Any objection Mr. Bizzari has to the proposed form of order **SHALL** be submitted within **THREE DAYS** of the date Suburban Waste's proposed form of order is filed.

**IT IS SO ORDERED.**