**COURT OF CHANCERY**
OF THE
**STATE OF DELAWARE**

ANDRE G. BOUCHARD
CHANCELLOR

Leonard L. Williams Justice Center
500 N. King Street, Suite 11400
Wilmington, Delaware 19801-3734

Date Submitted: April 12, 2017
Date Decided: April 17, 2017

Kevin G. Abrams, Esquire
J. Peter Shindel, Jr., Esquire
April M. Ferraro, Esquire
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19807

Edward B. Micheletti, Esquire
Cliff C. Gardner, Esquire
Lilianna Anh P. Townsend, Esquire
R. Garrett Rice, Esquire
Skadden, Arps, Slate, Meagher
   & Flom LLP
920 North King Street
Wilmington, DE 19899

RE:   ***T.J. Rodgers v. Cypress Semiconductor Corporation***
      Civil Action No. 2017-0070-AGB

Dear Counsel:

This letter constitutes the Court's post-trial decision on plaintiff T.J. Rodgers' request to inspect certain books and record of defendant Cypress Semiconductor Corporation ("Cypress") under 8 *Del. C.* § 220. For the reasons explained below, judgment will be entered in Rodgers' favor and Cypress will be required to produce the documents Rodgers sought in his demand letter dated January 19, 2017 (the "Demand") in the manner set forth below.

The facts recited in this ruling are my findings based on the testimony and documentary evidence of record from a trial held on April 12, 2017. I accord the evidence the weight and credibility I find it deserves.

## I.    Background

Cypress is a semiconductor design and manufacturing company with its principal place of business in San Jose, California. Rodgers founded Cypress in 1982 and served as its President and Chief Executive Officer for the next 34 years. He beneficially owns approximately 2.35% of Cypress' outstanding common stock.

In April 2016, Rodgers resigned from his position as Cypress' President and CEO, but he remained on the board until August.

On August 10, 2016, Cypress' board of directors, including Rodgers, appointed Hassane El-Khoury as the company's new President and CEO, and appointed Ray Bingham, who was then Chairman of the Board, as the Executive Chairman of the Board "to assist Mr. El-Khoury in his transition to the role of President and Chief Executive Officer."[1] The board meeting minutes describe the "Executive Chairman" position as "a newly created position in which Mr. Bingham will function as both an executive officer of the Company and as the Chairman of the Board of Directors."[2] Bingham's compensation as Executive Chairman, which Rodgers believes is excessive, includes almost $900,000 in bonus

---

[1] JX15 at 1.

[2] *Id.*

and salary per year, and a grant of $4.5 million of restricted stock units. At the end of its August 10 meeting, the board accepted Rodgers' resignation from the board.

On November 3, 2016, Lattice Semiconductor Corporation ("Lattice") publicly announced that it had signed a definitive merger agreement with an affiliate of Canyon Bridge Capital Partners, Inc. ("Canyon Bridge"), a global private equity buyout firm, pursuant to which Lattice would be acquired by Canyon Bridge. Because Canyon Bridge received its initial funding from investors in China, the transaction is currently awaiting approval by the Committee on Foreign Investment in the United States. The press release announcing the transaction described Bingham as a "Founding Partner" of Canyon Bridge and quoted Bingham's remarks on the merger.[3]

On December 1, 2016, Rodgers e-mailed Bingham, copying the rest of the board, suggesting that Bingham "lead an effort to eliminate Cypress' Executive Chairman position."[4] In his email, Rodgers laid out the case for why he thought the substantial costs the company was incurring to pay for the Executive Chairman position—equating to about a penny per share of Cypress stock—outweighed any benefits the Company was receiving from Bingham's service in that position. On December 7, 2016, Cypress' Chief Legal Officer responded to Rodgers' email,

---

[3] JX19 at 1.

[4] JX14.

3

stating that "the Board has received your email and is meeting to address each of your concerns."[5]

On December 9, 2016, Rodgers sent a letter to the Cypress board, expressing concern that Canyon Bridge was competing with Cypress for acquisition opportunities in the semiconductor industry and that Bingham had violated Cypress' Code of Business Conduct and Ethics by simultaneously serving as the Executive Chairman of Cypress and a founding partner of Canyon Bridge. The letter also stated that Bingham's involvement in Canyon Bridge "is not just a hypothetical conflict of interest problem; it presents tangible risk to Cypress stockholders."[6]

On January 19, 2017, Rodgers served on Cypress a demand to inspect certain books and records, including stocklist materials, under 8 *Del. C.* § 220. The Demand recited seven purposes for the requested inspection, including to:

- Communicate with stockholders of the Company regarding matters of common interest, including but not limited to the composition of the Company's Board of Directors.

- Investigate possible mismanagement and breaches of fiduciary duty by members of the Company's management and the Board.

- Evaluate the suitability of all current members of the Board to continue serving as directors of the Company.

---

[5] JX16.

[6] JX121 at 1.

- Evaluate the ability of the Board to consider impartially whether the Company should initiate litigation against Bingham, its Lead Independent Director, Chairman of the Audit Committee, and other current members of the management and/or the board.

- Evaluate possible litigation or other corrective measures.[7]

The Demand set forth eighteen categories of requested information, and enclosed a form of confidentiality agreement Rodgers was prepared to sign.

On January 26, 2017, Cypress responded to the Demand, agreeing to provide Rodgers with the requested stocklist materials, subject to the execution of a confidentiality agreement and payment of $2,500, and directing Rodgers to where he could find Cypress' publicly available bylaws.[8] The response otherwise denied the Demand, stating that "Rodgers is not entitled under Delaware law to inspect the Company's books and records for his remaining stated purposes because he has set forth no credible basis to infer that a non-exculpated breach of fiduciary duty has occurred."[9]

On January 30, 2017, Rodgers filed his complaint in this action to compel the production of the books and records requested in his Demand.

On February 3, 2017, Rodgers, through his trust, submitted a letter to Cypress in connection with Cypress' 2017 annual meeting of stockholders,

---

[7] JX24 at 2.

[8] JX11 at 1-2.

[9] *Id.* at 2-3.

announcing his intention to nominate J. Daniel McCranie and Camillo Martino to the board. On February 17, 2017, Rodgers publicly announced a proxy contest for this purpose.

## II. Analysis

Section 220(b) of the Delaware General Corporation Law provides that "any stockholder . . . shall, upon written demand under oath stating the purpose thereof, have the right . . . to inspect for any proper purpose . . . (1) the corporation's stock ledger, a list of its stockholders, and its other books and records." Cypress does not dispute that the Demand satisfies the form and manner requirements of Section 220. Rather, the basis of Cypress' defense is that Rodgers has failed to carry his burden to demonstrate a proper purpose.

### A. Rodgers Has Established a Proper Purpose for his Demand

Under Section 220(b), a proper purpose is one that is "reasonably related to such person's interest as a stockholder."[10] In *GM & M Group Inc. v. Carroll*, our Supreme Court held that, "once a proper purpose has been established, any secondary purpose or ulterior motive of the stockholder becomes irrelevant."[11]

A stockholder bears the burden of establishing a proper purpose "to inspect the corporation's books and records, other than its stock ledger or list of

---

[10] 8 *Del. C.* § 220(b).

[11] *CM & M Gp., Inc. v. Carroll*, 453 A.2d 788, 792 (Del. 1982).

stockholders."[12]  In *Seinfeld v. Verizon Communications, Inc.*, the Supreme Court

explained the nature of this burden when documents are sought to investigate

possible mismanagement, as follows:

> A stockholder is not required to prove by a preponderance of the evidence that waste and [mis]management are actually occurring. Stockholders need only show, by a preponderance of the evidence, a credible basis from which the Court of Chancery can infer there is possible mismanagement that would warrant further investigation – a showing that may ultimately fall well short of demonstrating that anything wrong occurred.  That threshold may be satisfied by a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing.
>
> Although the threshold for a stockholder in a section 220 proceeding is not insubstantial, the "credible basis" standard sets the lowest possible burden of proof.[13]

Rodgers asserts that his "primary purpose for seeking inspection of the

Demanded Materials is to investigate wrongdoing by Bingham and the Board.

Specifically, [he] seeks to investigate the extent of Bingham's conflict of interest

and to identify what steps, if any, the Board has taken to prevent harm to Cypress

as a result of that conflict."[14]

---

[12] 8 *Del. C.* § 220(c).

[13] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 123 (Del. 2006) (internal quotations omitted).

[14] Rodgers' Opening Pre-Trial Br. 16.

"It is well established that a stockholder's desire to investigate wrongdoing or mismanagement is a 'proper purpose.'"[15]  Here, I find that Rodgers has demonstrated, through documents, logic, and testimony, a credible basis to infer potential wrongdoing by Bingham.  Specifically, Rodgers has established a credible basis to infer that Bingham may have violated Cypress' Code of Business Conduct and Ethics (the "Code"), which applies to all "employees" of Cypress.

Section III.C.(i) of the Code states, as follows:

> You are prohibited from engaging in any activity that interferes with your performance or responsibilities to the Company or is otherwise in conflict or perceived conflict with the Company.  Our policies prohibit any employee from accepting simultaneous employment of any kind without written permission of the Company, and prohibit any employee from accepting simultaneous employment with a Company supplier, customer, developer or competitor.  Employees are prohibited from taking part in any activity that enhances or supports a competitor's position.  Additionally, you must disclose to the Company any interest that you have that may conflict with the business of the Company.[16]

Cypress does not dispute that Bingham simultaneously serves as the Executive Chairman of Cypress and a partner at Canyon Bridge, nor does Cypress assert that it was made aware of or approved Bingham's affiliation with Canyon Bridge before November 3, when Lattice announced its proposed acquisition by Canyon Bridge.  Thus, a "credible basis" exists to infer that Bingham violated the Code's

---

[15] *Seinfeld*, 909 A.2d at 121.

[16] JX20 at 2.

prohibition on "simultaneous employment of any kind without written permission of the Company."

Rodgers also credibly testified, consistent with other evidence in the record, that Canyon Bridge competes with Cypress in acquiring companies in the semiconductor industry. According to Rodgers, who is intimately familiar with Cypress from having led the company for 34 years until fairly recently, M&A has been critical to Cypress' survival in the constantly consolidating semiconductor industry and, in fact, Cypress made 32 acquisitions during his tenure.[17] On the other side of the ledger, Canyon Bridge describes itself as a "global private equity buyout firm" that seeks "control investments" in technology companies,[18] and it recently signed an agreement to acquire Lattice, which was an acquisition target of Cypress twice during the past five years, and which approached Cypress in 2016 as a potential "white knight" in response to Canyon Bridge's overture.[19] It thus is certainly reasonable to infer from the record that Cypress and Canyon Bridge are competitors for semiconductor-related acquisition targets.

Bingham, as Cypress' Executive Chairman and a member of its M&A evaluation team,[20] presumably has intimate knowledge of Cypress' M&A strategy

---

[17] Tr. 8-11.

[18] JX19 at 2.

[19] Tr. 29.

[20] Tr. 12.

and related confidential information. At the same time, he is a "Founding Partner" of Canyon Bridge. The dual hats Bingham wears suggest that his interests with respect to Canyon Bridge may well conflict with the business interests of Cypress.

Rodgers also testified, and Cypress did not dispute, that the telephone number listed under Canyon Bridge's investor contact information in its November 3 press release is a Cypress telephone, which has been answered by a Cypress secretary.[21] Cypress' Code prohibits its employees "from engaging in any activity that . . . is . . . in conflict or perceived conflict with the Company," and a credible basis exists to infer that Bingham has violated this prohibition of the Code.

Finally, Rodgers testified that, until seeing Lattice's November 3 press release, he as well as Cypress' CEO and Chief Financial Officer at the time did not know about Bingham's relationship with Canyon Bridge.[22] Cypress offered no contrary evidence on this point. Because Bingham was quoted in the press release as the "Founding Partner" of Canyon Bridge, it would be logical to infer that Bingham already was involved with Canyon Bridge before November 3. Thus, a credible basis exists to infer that Bingham may have violated the Code's

---

[21] Tr. 36-37.

[22] Tr. 28, 33. Rodgers' testimony on this point differed in certain respects from the contents of an anonymous letter he received in the mail. JX22. Cypress objected to the admissibility of this document on hearsay grounds. Since I have placed no weight on the document in question, that issue is moot.

10

requirement to "disclose to the Company any interest that [he has] that may conflict with the business of the Company."

## B. Cypress' Challenges to the Purpose of the Demand Are Without Merit

Relying on this Court's decision in *Southeastern Pennsylvania Transportation Authority v. AbbVie*, Cypress argues that because Cypress has a Section 102(b)(7) exculpatory provision in its certificate of incorporation, "to establish a proper purpose to inspect the Company's books and records, Rodgers must set forth a credible basis to believe that **the Board** breached its duty of loyalty or acted in bad faith."[23]  According to Cypress, Rodgers cannot make this showing because his allegations of misconduct focus on Bingham, and he has not provided any evidence of a non-exculpated breach of duty by a majority of Cypress' directors.  Cypress' reliance on *AbbVie* is misplaced.

In *AbbVie*, the Court found that certain stockholders of AbbVie, Inc. were not entitled to conduct a Section 220 inspection because they had failed to demonstrate a credible basis to infer that AbbVie's directors had breached a non-exculpated duty in connection with their approval of a substantial breakup fee that the company ended up paying when it withdrew from a proposed merger with Shire plc for tax reasons.  The Court observed that, "[t]here are a number of acceptable reasons why stockholders may seek to investigate corporate

wrongdoing—they may seek to institute possible derivative litigation, or they may seek an audience with the board to discuss reforms or, failing in that, they may prepare a stockholder resolution for the next annual meeting, or mount a proxy fight to elect new directors."[24] Critically, in finding that the plaintiffs were not entitled to conduct the requested inspection, the Court expressly found that initiating derivative litigation was "the ***sole motivation*** for the Plaintiffs' investigations into corporate wrongdoing among AbbVie's directors and officers."[25] That is not the case here.

Unlike in *AbbVie*, I find here that the pursuit of derivative litigation is ***not*** Rodgers' sole motivation for investigating wrongdoing. Rodgers' Demand states several purposes, including his desire "to communicate with stockholders of the Company regarding matters of common interest," to "evaluate the suitability of all current members of the Board to continue serving as directors of the Company," and "to evaluate possible litigation or other corrective measures."[26]

---

[23] Cypress' Pre-Trial Answering Br. 10 (emphasis added).

[24] *Se. Pa. Transp. Auth. v. AbbVie, Inc.*, 2015 WL 1753033, at *11 (Del. Ch. Apr. 15, 2015).

[25] *AbbVie*, 2015 WL 1753033, at *12 (emphasis added). The Court in *AbbVie* further stated that nothing in its decision "should be read to hold that directors' breaches of exculpated duties can never be a basis to support a Section 220 request *on grounds other than pursuit of derivative litigation*." *Id.* at * 13 n.107 (emphasis added).

[26] JX24 at 2.

The record supports that these other purposes are genuine. For example, before making his Demand, Rodgers twice communicated with the Cypress board privately in an effort to address his concerns about the company's continued expenditure of funds on the Executive Chairman position, and about the apparent conflicts of interest arising from Bingham's involvement with Canyon Bridge.[27] Rodgers, a significant stockholder who would have no apparent reason to hurt the company, also testified credibly that, depending on what he discovered as a result of his Demand, he hoped to pursue further dialogue with the board to work out resolutions outside of litigation.[28] In sum, because Rodgers has demonstrated credible bases to infer wrongdoing by Bingham and a genuine desire to pursue corrective actions outside of derivative litigation, it is irrelevant whether Rodgers has established a credible basis to infer a non-exculpated breach of fiduciary duty by any of the other members of Cypress' board.

Cypress also argues that investigating wrongdoing is not Rodgers' actual purpose for making his Demand. According to Cypress, the real reasons for Rodgers' Demand is to exact revenge against Bingham, and to serve as an impermissible tactic in furtherance of his proxy contest.[29]

---

[27] *See* Tr. 40-44; JX14; JX121.

[28] Tr. 49-50.

[29] Tr. 163, 166.

13

In *Pershing Square, L.P. v. Ceridian Corp.*, then-Chancellor Chandler held that:

> A corporate defendant may resist demand where it shows that the stockholder's stated proper purpose is not the actual purpose for the demand. This showing is not made where a secondary improper purpose exists. Instead, in order to succeed, the defendant must prove that the plaintiff pursued its claim under false pretense, and its primary purpose is indeed improper. Such a showing is fact intensive and difficult to establish.[30]

Based on Rodgers' testimony, which I generally found to be highly credible, and the other evidence of record, I am not convinced that Rodgers' actual purpose is to pursue a personal vendetta against Bingham. As this Court has observed, "our courts have given credence to such [personal animosity] defenses only where it is evident from the facts on the record that the plaintiff's actual, predominating, purpose is something unrelated to the plaintiff's purpose as a stockholder."[31] The evidence here does not support such a conclusion.

As to the proxy contest, Rodgers testified at trial that he "did not file this action for the purpose of [the] proxy contest," and that this action "is not a part of [his] strategy in the proxy contest."[32] In his preliminary proxy statement filed on March 7, 2017, he further stated that:

---

[30] *Pershing Square, L.P. v. Ceridian Corp.*, 923 A.2d 810, 817 (Del. Ch. 2007).

[31] *Sutherland v. Dardanelle Timber Co.*, 2006 WL 1451531, at *9 (Del. Ch. May 16, 2006).

[32] Tr. 96.

14

My efforts to address these matters privately have met no success, so I had to submit a demand letter . . . for the Company's books and records to obtain further information. Despite my request . . . , the Board has refused to provide the requested information.

It was against this background that I felt I had no choice but to file the required papers to nominate Messrs. McCranie and Martino for election to the Cypress Board.[33]

Rodgers similarly testified at trial that the proxy contest was the result of Cypress' refusal of his Demand, not the other way around.[34] In my view, Rodgers' Demand and the proxy contest appear to be parallel efforts to address the same perceived misconduct, but Cypress has not sustained its burden to prove that Rodgers' actual purpose for making the Demand was to aid his proxy contest in an improper manner.

Although I conclude that Rodgers' ongoing proxy contest against Cypress does not bar him from inspecting Cypress' books and records, that does not mean Rodgers may freely use Cypress' confidential information in his proxy contest. In *Disney v. Walt Disney Co.*, then-Vice Chancellor Lamb explained that there is a "presumption that the production of nonpublic corporate books and records to a stockholder making a demand pursuant to Section 220 should be conditioned upon a reasonable confidentiality order."[35] The *Disney* Court commented that it would

---

[33] JX132 at 3.

[34] Tr. 48-49.

[35] *Disney v. Walt Disney Co.*, 857 A.2d 444, 447 (Del. Ch. 2004).

"entertain an application for relief from a Section 220 confidentiality agreement" for purposes of allowing information to be used in an active proxy solicitation, but it emphasized that "the burden on the moving party would be heavy." [36]

A confidentiality order is in place in this case. Consistent with the Court's decision in *Disney*, the documents to be produced in response to the Demand (discussed below) will be produced subject to the terms of that order. If Rodgers believes that the company has designated a document confidential or highly confidential improperly, or that there is otherwise a legitimate basis for permitting the public disclosure of information produced in response to the Demand, the parties should confer in good faith immediately to resolve the matter, and only then seek the Court's assistance, if necessary.

### C.    The Scope of the Production

The Demand seeks eighteen categories of documents. Categories 10 and 11 have been satisfied.[37] Categories 12-18 concern stocklist materials. Cypress produced certain stocklist materials to Rodgers in March, and has agreed to produce updated stocklist materials to him upon request on the condition that he reimburses the company for the associated costs.[38] That leaves categories 1-9.

---

[36] *Id.* at 448-49.

[37] *See* Tr. 91-92; JX11 at 1-2.

[38] Given that the parties are engaged in an active proxy contest, those materials should be provided promptly when requested to ensure a level playing field. *See Hatleigh Corp. v.*

16

Categories 1-9 each seek "[a]ll documents provided to the Board, Senior Management (meaning the Company's Chief Executive Officer, Chief Financial Officer, Chief Legal Officer, or Chief Technical Officer), and/or any members of the Board or Senior Management relating to or referencing:"

1. Bingham's employment by, or affiliation with, Canyon Bridge or any entities related to Canyon Bridge.

2. Bingham's employment by, or affiliation with, any competitor of the Company other than Canyon Bridge.

3. Canyon Bridge's affiliation or association with the Chinese government.

4. Canyon Bridge's acquisition of Lattice.

5. A potential acquisition of Lattice by the Company.

6. Canyon Bridge's acquisition of, or intent to acquire, any other semiconductor-related entity.

7. Bingham's compliance with the Code, including without limitation Board minutes, Board committee minutes, and notes of discussions (whether formal or informal) between or among the Chairman of the Audit Committee, the Executive Chairman, and any other Board Members or Senior Management.

8. Any proposed or actual amendments or modifications to the Code.

---

*Lane Bryant, Inc.*, 428 A.2d 350, 354-55 (Del. Ch. 1981) ("Once having established a proper purpose, a stockholder is entitled to the same lists and data relating to stockholders as is available to the corporation. To hold otherwise would be to give the corporation an unfair advantage in a proxy solicitation battle. The best interest of the stockholders requires that they quickly receive all the information generated by the competing interests.").

9. Any waiver(s) from compliance with the Code by any member of the Board or of Senior Management.

Rodgers has established in my view that each of these categories is essential to the purposes in his Demand,[39] and Cypress does not seriously contend otherwise. Accordingly, subject to the qualifications discussed next, the documents requested in categories 1-9 will be produced.

During post-trial argument, Rodgers agreed to limit the time period for the documents for each category to the period from January 1, 2016 to the present. This is reasonable and will be ordered.

Two points of disagreement remain concerning (1) the scope of individuals for whom documents will be produced, and (2) whether "communications" involving these individuals must be produced.

On the first issue, Cypress contends that Rodgers only should receive documents provided to Cypress' directors, and not those that were provided to members of Senior Management, as defined in the Demand. Rodgers, on the other hand, requests documents that were provided to Cypress' directors as well as its CFO, who is not a director, because the CFO has certain responsibilities under the

_____

[39] "A shareholder who has discharged his burden of showing his entitlement to a Section 220 inspection must also satisfy an additional burden—to show that the specific books and records he seeks to inspect are essential to the accomplishment of the stockholder's articulated purpose for the inspection." *Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 371 (Del. 2011). "A document is essential for Section 220 purposes if, at a minimum, it

Code that are relevant to the purposes in his Demand. I agree with Rodgers that documents provided to the CFO—which were specifically requested in the Demand—are essential to Rodgers' purposes and should be produced along with documents that were provided to the board or any of its members individually.

On the second issue, Rodgers seeks to expand his inspection to include "communications involving any of the directors" and the CFO concerning the topics in categories 1-9.[40] Cypress objects, noting that the Demand did not seek such "communications." I agree with Cypress, with one qualification. Because the Demand did not seek "communications involving" the directors or others, I will not allow Rodgers to expand the scope of his requested inspection now. In other words, consistent with the Demand, Cypress is only required to produce documents "provided to" the board or any of its members individually, as well as the CFO, concerning each of the topics in categories 1-9.

The one qualification is that category 7 specifically seeks "notes of discussions (whether formal or informal) between or among the Chairman of the Audit Committee, the Executive Chairman, and any other Board Members or Senior Management" concerning Bingham's compliance with the Code. These

addresses the crux of the shareholder's purpose, and if the essential information the document contains is unavailable from another source." *Id.* at 371-72.

[40] *See* Tr. 178; Letter from Abrams & Bayliss LLP dated Apr. 13, 2017.

materials are relevant and essential to Rodgers' purposes and thus will be produced as well in whatever format such "notes" may exist, including e-mails.

* * * * *

The parties are directed to confer and submit a form of order in accordance with this ruling within two business days. The order should provide for all responsive documents to be produced within five business days from the date of its entry.

Sincerely,

*/s/ Andre G. Bouchard*

Chancellor

AGB/gm