# THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MUDRICK CAPITAL MANAGEMENT, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0351-TMR |
| | ) | |
| GLOBALSTAR, INC., | ) | |
| | ) | |
| Defendant. | ) | |

# MEMORANDUM OPINION

Date Submitted: July 16, 2018
Date Decided: July 30, 2018

A. Thompson Bayliss, Michael A. Barlow, and Adam K. Schulman, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Jordan Goldstein, David Elsberg, Joshua Margolin, and Ron Krock, SELENDY & GAY PLLC, New York, New York; *Attorneys for Plaintiff*.

Robert S. Saunders, Joseph O. Larkin, Arthur R. Bookout, Matthew P. Majarian, and Stephen J. Della Penna, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; Albert L. Hogan III, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Chicago, Illinois; *Attorneys for Defendant*.

**MONTGOMERY-REEVES, Vice Chancellor.**

This case involves a stockholder demand to inspect the books and records of Globalstar, Inc. ("Globalstar" or the "Company"). On April 25, 2018, Globalstar announced its merger with Thermo Acquisitions, Inc. ("Thermo"). In this transaction, Globalstar will acquire assets controlled or owned by the CEO and controlling stockholder of the Company, James Monroe. As a result of the transaction, the controlling stockholder's interest in the surviving entity would increase from 53% to over 80%, while all minority stockholders would be severely diluted.

Concerned with both the merger process and stock dilution, Mudrick Capital Management, L.P. ("Mudrick Capital"), the Company's largest minority stockholder, sent a demand to inspect the books and records of the Company on May 4, 2018. The demand included seven purposes and fourteen categories of requested documents. Globalstar rejected the demand and produced no documents. This litigation ensued.

In an effort to resolve this litigation, the parties significantly narrowed the issues. First, Globalstar stipulates that Mudrick Capital's demand letter complies with the form and manner requirements of 8 *Del. C.* § 220 and that Mudrick Capital has standing to pursue this action. Globalstar also stipulates that six of the seven purposes listed in the demand state a proper purpose to obtain books and records

under 8 *Del. C.* § 220.[1]  Second, Mudrick Capital narrowed its document requests. Third, Globalstar produced 188 documents pre-trial and an additional 1,100 documents post-trial in response to the demand.

Unfortunately, the parties' efforts to resolve the litigation were unsuccessful, and Mudrick Capital continues to seek (1) emails and other communications related to Mudrick Capital's narrowed document requests from four custodians; (2) documents and communications related to the valuation of one of the merger assets, FiberLight, LLC, and the 2016 failed sale of FiberLight; and (3) draft materials, including (a) drafts of board and special committee minutes and (b) internal drafts of the merger agreement, term sheets, and the letter of intent. Globalstar responds that these documents are not necessary because the documents produced provide Mudrick Capital with sufficient information to address Mudrick Capital's purposes.

For the reasons stated in this memorandum opinion, I conclude that Mudrick Capital has shown that some, but not all, of the books and records it requests are necessary to address its purposes.  I hold that (1) Plaintiff may inspect (a) certain emails and other communications and (b) documents and communications related to

---

[1]  One purpose remains disputed.  The parties agree that I need not address whether the seventh purpose is proper because none of the demanded documents are exclusive to that purpose.

the valuation of FiberLight and the 2016 failed sale of FiberLight; (2) Plaintiff may not inspect Draft Materials;[2] and (3) Defendant must produce a privilege log that reflects documents withheld or redacted for any privilege for all productions, including past productions.

## I.  BACKGROUND

The facts in this opinion reflect my findings based on admitted allegations in the pleadings, stipulated facts, trial testimony, and 182 documentary exhibits.  I grant the evidence the weight and credibility that I find it deserves.[3]

### A.  The Proposed Merger

#### 1.  Events before the merger announcement

Defendant Globalstar is a Delaware corporation with its principal executive offices in Louisiana.[4]  Globalstar provides "mobile satellite voice and data services,"[5] and the Company has rights to use wireless spectrum bandwidth.[6]

---

[2]  "Draft Materials," as used in this Memorandum Opinion, means only those draft materials that remain in dispute.  For all other draft materials, the existing agreements of the parties remain in effect.  *See, e.g.*, *infra* p. 17.

[3]  Citations to the trial transcript are in the form "Tr. #."  Joint Trial Exhibits are cited as "JX #."  Facts drawn from the Joint Pre-Trial Stipulation and Order are cited as "PTO ¶ #."  Citations to the parties' briefs are to their post-trial briefs.

[4]  PTO ¶ 30.

[5]  *Id.* ¶ 31.

[6]  Tr. 10:23-11:1.

Wireless spectrum is the bandwidth where wi-fi signal is transmitted.[7] As more technology uses wi-fi, this unique wireless spectrum will become scarcer and, thus, more valuable.[8]

Globalstar is controlled by non-party and majority stockholder James (Jay) Monroe III.[9] He currently owns approximately 53% of Globalstar's shares through entities he controls.[10] He also serves as the Executive Chairperson of the Board and Chief Executive Officer of Globalstar.[11]

Plaintiff Mudrick Capital is an SEC-registered investment advisor specializing in distressed companies that it believes are undervalued by the stock market.[12] Mudrick Capital has been a stockholder of Globalstar since 2014 and is currently the largest minority stockholder, beneficially owning approximately 5.6% of Globalstar's outstanding voting capital stock.[13]

---

[7]    Tr. 63:23-64:12.

[8]    Tr. 10:23-11:4, 156:3-7.

[9]    *See* PTO ¶ 33.

[10]    *Id.*

[11]    *Id.*

[12]    *Id.* at ¶ 26; Tr. 7:12-8:12.

[13]    PTO ¶¶ 27-29; Tr. 8:24-9:18.

4

Mudrick Capital's evaluation of Globalstar as an investment is largely based on the potential increase in value of wireless spectrum rights over time.[14] Using the estimated value of Globalstar's assets, including its wireless spectrum rights, Mudrick Capital valued the stock at more than $6.60 per share as of January 2017.[15] And Monroe[16] agreed with this value during the January 2017 investor call.[17]

Despite the possibly enormous potential of Globalstar's wireless spectrum rights, the Company has had liquidity issues due to a loan that requires large payments every year.[18] To resolve the cash flow problems created by the loan, Globalstar has raised capital through equity offerings in the past.[19] But the 2017 offering was not sufficient to resolve the continuing problem. Globalstar projected

---

[14] Tr. 11:1-4.

[15] JX 3, at 13-14.

[16] My usual practice is to identify individuals by their last names without honorifics. In this case, the risk of confusion between Mr. Mudrick, the biological person, and Plaintiff Mudrick Capital Management, L.P., warrants an exception. The same risk does not exist for others, who are identified without honorifics. No disrespect is intended.

[17] JX 3, at 13 (Mudrick: The Company has "an equity value of $8.7 billion, which is $6.60 per share. Does all that math sound right?" Monroe: "Yes, I understand the math and I don't disagree with any of it.").

[18] Tr. 18:2-5.

[19] *See, e.g.*, JX 16, at 6.

that it would have insufficient funds to meet its loan obligations through the end of 2018.[20]

Aware of these liquidity issues, Mudrick Capital sent a proposal to the Globalstar Board of Directors (the "Board").[21] Mudrick Capital offered to lend Globalstar $150 million in a nonconvertible financing instrument to (1) enable Globalstar to access liquidity to pay amounts due on the loan through at least the end of 2019 and (2) prevent Globalstar from diluting the ownership of minority stockholders through future equity offerings.[22] In addition to sending the offer to the Board members, Mudrick Capital publicly filed it with the SEC in an effort to prevent Globalstar stock value from continuing to decline, as it had done for the last three calendar quarters.[23] Globalstar did not substantively respond to Mudrick Capital's offer.[24]

---

[20]     Tr. 143:7-19.

[21]     JX 31, at 1.

[22]     *Id.* at 2-3; Tr. 17:10-18:10.

[23]     JX 30, at 16, 23-24; Tr. 188:13-190:2.

[24]     Tr. 20:9-21.

## 2. The merger announcement and structure of the proposed merger

The Globalstar Board created a special committee of four purportedly independent directors (the "Special Committee") to investigate, negotiate, and approve (or disapprove) a merger transaction with Thermo, an entity controlled by Monroe.[25] The Special Committee and the Board unanimously approved the terms of the Agreement and Plan of Merger dated April 24, 2018 (the "Merger Agreement").[26] On April 25, 2018, Globalstar issued a press release announcing its merger with Thermo (the "Merger"), valued at approximately $1.645 billion.[27] As part of the Merger, Thermo will merge with a wholly owned subsidiary of Globalstar.[28] Globalstar will receive the following assets:

- Nearly 100% of the outstanding membership interests of FiberLight;[29]

- $100 million in cash;[30]

- 15.5 million shares of common stock in CenturyLink, Inc.;[31]

---

[25] JX 14, at 1.

[26] PTO ¶ 51.

[27] JX 38, at 78.

[28] *Id.* at 12.

[29] *See id.*

[30] *Id.*

[31] *Id.*; Tr. 22:17-22, 54:23-24.

7

- Certain property in Covington, Louisiana, together with development and construction contracts relating to improvements of the property and sufficient cash to complete improvements on the property;[32] and

- Minority interests in both Pivotal Commware, Inc., and Orion Labs, Inc.[33]

According to the press release announcing the Merger Agreement, the summed values of the cash ($100 million), the CenturyLink stock ($275 million), and the Louisiana property and the minority interests in Pivotal Commware, Inc., and Orion Labs, Inc. (combined value of $25 million) is $400 million.[34] Simple arithmetic and logic indicate that the value assigned to FiberLight is $1.245 billion.

Thermo stockholders will receive "Globalstar common stock valued at" $1.645 billion.[35] The number of shares to be issued in the Merger is determined using the volume-weighted average market price of Globalstar common stock for the twenty trading days immediately before the closing.[36] The price of the stock is limited by a collar; the price cannot be less than 80% or more than 120% of the volume-weighted average market price of Globalstar common stock for the twenty

---

[32]     JX 38, at 12.

[33]     PTO ¶ 48; *see* JX 38, at 12.

[34]     JX 38, at 78.

[35]     *Id.*

[36]     PTO ¶ 49.

trading days immediately before the signing date of the Merger Agreement, or April 24, 2018.[37] Therefore, if there is a notable increase (or decrease) in the value of Globalstar stock during the twenty days before closing, this increase (or decrease) is effectively capped (or floored).

Jason Mudrick, the President and Chief Investment Officer of Mudrick Capital, testified that the price is limited to a range of $0.52-0.825.[38] Using this range, Globalstar must issue a minimum of approximately 2 billion shares and up to a maximum of approximately 3.2 billion shares.[39] As of February 16, 2018, approximately 1.3 billion shares of Globalstar voting common stock are outstanding.[40] The Merger will more than double—and possibly triple—the number of outstanding shares of Globalstar common stock.

Under the terms of the Merger Agreement, as the majority stockholder of Thermo, Monroe will receive the majority of the newly issued Globalstar stock.[41]

---

[37]  *Id.*

[38]  Tr. 60:8-15, 66:9-19. Using data from JX 58 (GSAT Historical Price/Volume Data), this Court calculates the range to be $0.55-0.83. The difference between this calculation and Mr. Mudrick's testimony has no impact on the parties' arguments or this Court's findings.

[39]  These estimates are calculated by dividing 1.645 billion by 0.52 and 0.825, respectively.

[40]  JX 27, at 33.

[41]  *See* JX 38, at 78, 80.

He currently owns, through entities he controls, approximately 53% of Globalstar stock.[42] After the Merger, he will own 83-87% of Globalstar stock.[43] In contrast, the minority stockholders' percentages of ownership will be diluted. For example, Mudrick Capital currently owns approximately 5.6% of Globalstar stock;[44] after the Merger, its ownership will be reduced to approximately 2%.[45] After the Merger closes, Globalstar "expects to initiate" a rights offering of up to $100 million for minority stockholders.[46]

### 3. Mudrick Capital's response to the proposed merger

Mr. Mudrick learned of the Merger on April 24, 2018, in a meeting with Monroe, Kyle Pickens (Vice President of Strategy & Communications), Tim Taylor (Vice President of Finance, Business Operations & Strategy), and Jim Lynch (CEO of FiberLight).[47] Mr. Mudrick immediately had concerns about the interested nature

---

[42] *Id.* at 80; PTO ¶ 33.

[43] JX 38, at 80.

[44] PTO ¶ 27.

[45] Tr. 66:24-67:4.

[46] JX 38, at 80.

[47] Tr. 21:2-23:2.

of the Merger for Monroe and also about Globalstar using stock to pay for the transaction at a time when Mr. Mudrick believed the stock was undervalued.[48]

Mr. Mudrick contacted Moelis & Company ("Moelis"), the investment bank that issued the fairness opinion.[49] He spoke with Lawrence Chu from Moelis, someone whom Mr. Mudrick knows both personally and professionally.[50] Chu indicated that he did not interact directly with Monroe, but instead with the Special Committee.[51] Chu suggested that the members of the Special Committee were not truly independent because Monroe, as the controlling stockholder, handpicks the board members.[52] Chu also informed Mr. Mudrick that he (Chu) had asked the Special Committee to reach out to Mudrick Capital regarding its financing offer and that he was surprised to hear that the Special Committee had not done so.[53]

---

[48]    Tr. 23:10-15; JX 31, at 2.

[49]    Tr. 24:17-25:3.

[50]    Tr. 26:5-8.

[51]    Tr. 26:14-16.

[52]    Tr. 26:19-27:10.

[53]    Tr. 27:13-22.

A few days later, on April 28, 2018, Mr. Mudrick met with Globalstar representatives, including Monroe.[54] During this meeting, Mr. Mudrick learned that Globalstar had been planning this Merger for "a little over a year."[55]

Later that same day, Mr. Mudrick met alone with Taylor.[56] He asked Taylor why the Special Committee had not asked for a majority-of-the-minority vote to protect the minority stockholders.[57] Taylor responded that the deal was more certain to get approval without such a provision.[58]

### 4. Other responses to the proposed merger

On April 25, 2018, the day of the Merger announcement, the price of Globalstar stock dropped from $0.70 to $0.65.[59] On the date of the trial, the stock price was $0.47.[60] Currently, Globalstar shares are trading in the range of $0.40 to $0.46 per share. But it is not clear whether the stock price decrease is a response to

---

[54]  Tr. 29:16-31:15.

[55]  Tr. 31:6-8.

[56]  Tr. 32:15-18.

[57]  Tr. 32:20-21.

[58]  Tr. 32:22-33:16.

[59]  JX 58, at 22.

[60]  Tr. 28:7.

the Merger or to something else entirely, as the stock price has been declining over the past twelve months.

On April 26, 2018, the day after the Merger announcement, Cowen, an independent investment research firm,[61] issued a report titled "An Expensive Solution to Globalstar's Liquidity Woe's."[62] Cowen's top-line summary states:

> Yesterday morning, Globalstar announced plans to buy assets controlled by its Chairman and CEO, worth about $1 billion on our estimates, for a nominal $1.65 billion worth of shares many believe were already undervalued. The best that can be said is that it's an incredibly expensive fix to the company's liquidity woes; we expect considerable push back from Globalstar's non-affiliated shareholders.[63]

The report specifically notes that minority stockholders "would see their percentage ownership reduced to little more than a third of today's ownership."[64] The report also assigns a net equity value of $336 million to FiberLight,[65] a stark difference from the $1.245 billion indicated by the press release.[66]

---

[61]     Tr. 49:6.

[62]     JX 44.

[63]     *Id.* at 1.

[64]     *Id.*

[65]     *Id.*

[66]     *See supra* p. 8.

### B. Mudrick Capital's Demand for Books and Records, Globalstar's Response to the Demand, and This Litigation

On May 4, 2018, Mudrick Capital sent its demand for books and records to Globalstar's Corporate Secretary and its Registered Agent.[67] The demand listed seven purposes for requesting books and records and sought fourteen categories of documents, not including subcategories.[68]

On May 11, 2018, Globalstar responded to Mudrick Capital's demand, stating that it "fail[ed] to state a proper purpose for inspecting the Company's books and records because it d[id] not demonstrate that Mudrick [Capital] ha[d] a credible basis for suspecting wrongdoing by the directors or officers of Globalstar."[69] It also stated that "the requests in the Demand [were] not 'circumscribed with rifled precision' nor 'essential and sufficient' to the stated purpose of the Demand."[70] But Globalstar offered to meet and confer to discuss the Company's "willingness" to provide Mudrick Capital with documents.[71]

---

[67]  JX 57.

[68]  *Id.* at 1-2, 6-8.

[69]  JX 60, at 1.

[70]  *Id.* at 3.

[71]  *Id.* at 4.

On May 17, 2018, Mudrick Capital filed its Verified Complaint for Inspection of Books and Records.[72]

On June 25, 2018, eight days before trial, Globalstar produced 188 documents to Mudrick Capital in response to the Section 220 Demand.[73]

On June 28, 2018, the parties filed their Joint Pre-Trial Stipulation and Order ("Pre-Trial Order").[74]  In this document, Globalstar stipulates that six of the seven purposes in Mudrick Capital's demand are proper.[75]  The undisputed purposes relate to investigating possible breaches of fiduciary duty by the Board and Special Committee concerning the Merger, the Merger Agreement, and the related voting agreement; evaluating the fairness of the Merger and the independence of the members of the Special Committee; valuing Mudrick Capital's stock; and communicating with other minority stockholders regarding litigation and other potential corrective measures.[76]  Only one purpose remains disputed, but the parties

---

[72]     JX 73.

[73]     Pl.'s Opening Br. 1.

[74]     JX 122.

[75]     PTO ¶ 63.

[76]     *Id.* ¶ 3.

agree that I need not resolve this dispute because none of the demanded documents are exclusive to this purpose.[77]

In the Pre-Trial Order, Plaintiff narrows its original fourteen requests for books and records by (1) removing its request for FiberLight valuation materials related to past litigation; (2) limiting its request regarding the valuation of Globalstar to materials in three data rooms and documents exchanged with only two specific entities; (3) removing two requests; and (4) amending the definition of "Selected Books and Records" to exclude Globalstar executive officers.[78]

This Court held a one-day trial on July 3, 2018. Only one witness gave testimony: Mr. Mudrick.

The parties engaged in further discussions after the trial. Globalstar agreed to produce the following additional documents:

---

[77] The disputed purpose is to investigate

> possible breaches of fiduciary duty, misappropriation of information, mismanagement, corporate waste, and improper influence and conduct by the Company's controlling stockholder, Chief Executive Officer and Chairman of the Board, James Monroe III, that had the purpose or effect of artificially reducing the share trading price of [Globalstar's] Common Stock, which in turn had the purpose or effect of making the Merger highly dilutive for [minority stockholders].

JX 57, at 1-2.

[78] Pl.'s Opening Br. 7; *see* PTO ¶ 67.

- All draft and final notes, agendas, and written consents;

- All drafts of the Merger Agreement and draft and final term sheets exchanged between Globalstar and the Thermo Companies;

- All director and officer insurance documents concerning director independence (to the extent any exist);

- All non-email material concerning Moelis's selection;

- All draft and final non-email materials given to the Board and to the Special Committee;

- All documents in the three data rooms; and

- All materials given to Globalstar's advisors.[79]

After the parties' resolution of several issues, Mudrick Capital seeks the following additional documents:

- Emails and other communications transmitted or dated January 1, 2017, to May 4, 2018, and sent to, received by, or in the possession of Globalstar CEO and Board of Directors Chair James Monroe, Globalstar General Counsel L. Barbee Ponder IV, Special Committee Chair J. Patrick McIntyre, or Special Committee member John M.R. Kneuer relating to the Merger, the Merger Agreement, or the voting agreement; the Merger assets or liabilities, including FiberLight and CenturyLink; the establishment, independence, or disinterestedness of the Special Committee; advisors or legal counsel in connection with the Merger or alternatives to the Merger; or any alternatives to the Merger considered by the Board or the Special Committee;

- Documents, including final and draft documents, and communications transmitted or dated January 1, 2016, to May 4, 2018, relating to the valuation of FiberLight or the 2016 failed sale of FiberLight; and

---

[79]    Pl.'s Opening Br. 9-10.

- Draft Materials dated January 1, 2017, to May 4, 2018, including (a) drafts of Board and Special Committee minutes and (b) internal drafts of the Merger Agreement, term sheets, and the letter of intent.[80]

## II. ANALYSIS

Under Section 220 of Delaware General Corporation Law, stockholders of a Delaware corporation may inspect the books and records of a company for any proper purpose.[81] A proper purpose includes "a purpose reasonably related to such person's interest as a stockholder."[82] "It is well established that a stockholder's desire to investigate wrongdoing or mismanagement is a 'proper purpose.'"[83] The stockholder, however, must present "some evidence that establishe[s] a credible basis from which [this Court] could infer there [are] legitimate issues of possible waste, mismanagement or wrongdoing that warrant[] further investigation."[84]

Mudrick Capital identifies seven purposes for its demand.[85] Globalstar stipulates, for purposes of this litigation only and without waiver to challenge the allegations in Mudrick Capital's demand and complaint in any future litigation, that

---

[80]   *Id.*, Proposed Order & J. ¶¶ 3-4.

[81]   8 *Del. C.* § 220.

[82]   *Id.* § 220(b).

[83]   *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006).

[84]   *Id.* at 118.

[85]   JX 57, at 1-2.

it does not contest six of these purposes.[86] Globalstar states that due to its stipulations, "no finding of a credible basis to suspect wrongdoing or mismanagement is required."[87] Thus, the only question for this Court to resolve is the scope of any further inspection.

The scope of inspection is limited to only those books and records that are "necessary and essential to accomplish the stated, proper purpose."[88] "Documents are 'necessary and essential' pursuant to a Section 220 demand if they address the 'crux of the shareholder's purpose' and if that information 'is unavailable from another source.'"[89] "[T]he burden of proof is always on the party seeking inspection to establish that each category of the books and records requested is essential and sufficient to the stockholder's stated purpose."[90] "[W]here a [Section] 220 claim is based on alleged corporate wrongdoing, and assuming the allegation is meritorious, the stockholder should be given enough information to effectively address the

---

[86]  PTO ¶ 63.

[87]  *Id.* ¶ 75.

[88]  *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 116 (Del. 2002).

[89]  *Wal-Mart Stores, Inc. v. Ind. Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1271 (Del. 2014) (quoting *Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 371-72 (Del. 2011)).

[90]  *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996).

19

problem, either through derivative litigation or through direct contact with the corporation's directors and/or stockholders."[91]

Mr. Mudrick gave testimony for several hours, and he testified credibly. As an investment fund manager, his knowledge of Globalstar, a Mudrick Capital investment, is quite extensive. Mr. Mudrick understands the business strategy of Globalstar as it relates to wireless spectrum rights; he participates in investor conference calls; and he meets individually with Globalstar's Board members and management.

Before testifying, Mr. Mudrick reviewed the 188 documents produced by Globalstar.[92] He testified that Globalstar's production was deficient with respect to Mudrick Capital's demand in multiple ways. The production lacked the following requested documents:

- Emails related to the stated purposes; [93]

- Documents concerning the valuation of FiberLight;[94]

- Draft board minutes; [95]

---

[91] *Saito*, 806 A.2d at 115.

[92] Tr. 76:13-20.

[93] Tr. 76:21-76:23.

[94] Tr. 106:13-107:2.

[95] Tr. 76:24-77:2.

20

- Draft presentations;[96] and

- Draft agendas.[97]

Globalstar's production also failed to include any privilege log to indicate whether documents were withheld or on what basis documents were redacted.[98]

After Mr. Mudrick testified as to what was missing from the production, he credibly testified as to issues and questions raised by the Merger and by documents included in the production. A selection of those issues and questions are laid out here:

- Monroe owns a majority of Thermo stock;[99]

- Globalstar is paying $1.645 billion for the Merger assets that are controlled by Monroe with no explanation for that valuation; in particular, the Company valued FiberLight at $1.245 billion, although it is likely worth $300-500 million;[100]

- The Special Committee valued FiberLight at $1.245 billion, but all the information concerning FiberLight appears to have come from Monroe;[101]

---

[96]    Tr. 77:3-77:6.

[97]    *Id.*

[98]    Pl.'s Opening Br. 10.

[99]    Tr. 54:19-24; PTO ¶ 34.

[100]   Tr. 42:23-51:4.

[101]   Tr. 92:14-96:23; *see* JX 117, at 2.

- Neither the Special Committee nor Moelis appear to have included in their analysis the failed attempt to sell FiberLight in 2016 for less than $500 million;[102]

- There are unresolved accounting and governance concerns surrounding FiberLight, which are cited in the Special Committee minutes as issues that may affect FiberLight's value;[103]

- The Special Committee was negotiating for much of the time without an outside financial advisor;[104]

- The Special Committee initially retained conflicted advisors (Allen & Co. and Centerview Partners) to advise on the Merger, while those advisors were also representing the Company in a possible sale of Globalstar;[105]

- Moelis in its fairness opinion disclaimed having performed "any independent evaluation or appraisal of any of the assets included" in the Merger transaction;[106]

- The Special Committee's negotiations were very brief, and the limited information provided in the Board and Special Committee minutes regarding the negotiations contradicts the April 24, 2018 Moelis presentation.[107]

---

[102]    Tr. 95:2-17.

[103]    Tr. 105:15-19, 108:5-109:1; JX 115, at 1-2.

[104]    Tr. 92:14-96:23; *see* JX 117, at 2.

[105]    Tr. 126:20-127:11.

[106]    JX 117, at 2; Tr. 93:18-94:1.

[107]    Tr. 86:19-87:4; *compare* JX 118 *with* Pl.'s Opening Br., Ex. 2, at 1 (contradictory dates of negotiation).

- Globalstar is paying $162 million to Thermo to transfer Globalstar's $1.7 billion in net operating losses to Thermo;[108]

- Monroe proposed, and the Board unanimously approved, that the members of the Special Committee receive an award of 225,000 shares of Globalstar stock *on the same day* the Committee approved the price of their one and only counteroffer, which they did without the assistance of a financial advisor;[109]

- Globalstar's Corporate Secretary, Richard Roberts, is also Thermo's general counsel;[110]

- Monroe told Mr. Mudrick that he (Monroe) expected to get sued in connection with the Merger, was prepared for the same, and advised people to be careful in their writings in anticipation of litigation;[111]

- Special Committee minutes reference that Monroe had contacted all of the Special Committee members and that they were instructed not to speak to Monroe directly;[112] and

- The Chair of the Special Committee has a son who was hired as a regional sales manager at Globalstar during the period the Special Committee was considering the Merger.[113]

Several documents strongly support Mr. Mudrick's testimony:

- Special Committee minutes state that "[t]he members of the Committee asked numerous questions regarding . . . the potential conflicts of

---

[108]    Tr. 22:11-16, 52:2-55:10.

[109]    Tr. 123:13-124:24; JX 126, at 11-12.

[110]    Tr. 80:9-12.

[111]    Tr. 82:3-8.

[112]    Tr. 114:2-7.

[113]    Tr. 118:22-119:2; JX 123, at 12; JX 124, at 2.

23

interest and a discussion ensued" but give no information regarding these "potential conflicts of interest";[114]

- Special Committee minutes state that the members of the Special Committee requested an evaluation of each member's independence and, after the evaluation, a report of the results,[115] but no subsequent minutes reference any such report;

- Special Committee minutes state that each member of the Special Committee had conversations with Monroe about the Merger and that the members agreed that "independent conversations with Mr. Monroe on the terms of the contemplated [Merger] transaction should be avoided to the extent possible";[116]

- The Special Committee's counsel advised the Special Committee that "it is appropriate to discuss further a minority shareholder vote requirement given the related party nature" of the Merger,[117] and the Special Committee wanted a majority-of-the-minority provision;[118]

- Thermo's counsel advised the Special Committee against requesting a majority-of-the-minority provision in the Merger;[119]

- Special Committee minutes state that FiberLight's accounting issues may "result in a material change that would necessitate revisiting the transaction value"; but no subsequent minutes address these issues, and the value does not appear to change.[120]

---

[114]  Pl.'s Opening Br., Ex. 7, at 2.

[115]  *Id.*, Ex. 8, at 1.

[116]  *Id.*, Ex. 10, at 1.

[117]  *Id.*, Ex. 3, at 2.

[118]  JX 110, at 2.

[119]  Pl.'s Opening Br., Ex. 6, at 2-3.

[120]  JX 115, at 2.

The produced documents raise, but do not resolve, the same issues described in Mr. Mudrick's testimony. They also suggest that there were communications outside the produced documents that directly relate to these issues.

Mudrick Capital's stated purposes are to investigate possible breaches of fiduciary duty by the Board and Special Committee concerning the Merger, the Merger Agreement, and the related voting agreement; evaluate the fairness of the Merger and the independence of the members of the Special Committee; value Mudrick Capital's stock; and communicate with other minority stockholders regarding litigation and other potential corrective measures.[121] The issues addressed in Mr. Mudrick's testimony and the produced documents go to the crux of these purposes. And the testimony and documents suggest that communications exist outside the produced documents that directly relate to these purposes.

## A. Mudrick Capital Is Entitled to Globalstar's Emails

Mudrick Capital seeks emails from January 1, 2017, to May 4, 2018, from (1) C.E.O., Chair, and controlling stockholder of Globalstar, James Monroe; (2) General Counsel of Globalstar, L. Barbee Ponder IV; (3) Chair of the Special Committee, Patrick McIntyre; and (4) member of the Special Committee, John Kneuer.[122]

---

[121] PTO ¶ 3.

[122] Pl.'s Opening Br. 10-11.

For the statutory tool provided in Section 220 "to be meaningful, . . . [a] stockholder who demands inspection . . . should be given access to all of the documents in the corporation's possession, custody or control, that are necessary to satisfy [that stockholder's] proper purpose."[123]  Generally, "[t]he source of the documents and the manner in which they were obtained by the corporation have little or no bearing on a stockholder's inspection rights.  The issue is whether the documents are necessary and essential to satisfy the stockholder's proper purpose."[124]  Thus, where the stockholder carries its burden of establishing that documents, including emails, are necessary for the stockholder's purpose, those documents must be produced.[125]

As the Delaware Supreme Court has held, "[d]ocuments are 'necessary and essential' pursuant to a Section 220 demand if they address the 'crux of the shareholder's purpose' and if that information 'is unavailable from another source.'"[126]  Although "[t]he starting point—and often the ending point—for a

---

[123]  *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 114-15 (Del. 2002).

[124]  *Id.* at 118.

[125]  *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 792 (Del. Ch. 2016); *Lavin v. W. Corp.*, 2017 WL 6728702, at *14 (Del. Ch. Dec. 29, 2017).

[126]  *Wal-Mart Stores, Inc. v. Ind. Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1271 (Del. 2014) (quoting *Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 371-72 (Del. 2011)).

sufficient inspection will be board level documents evidencing the directors' decisions and deliberations, as well as the materials that the directors received and considered," this is a case in which the production of emails in response to a Section 220 demand is warranted.[127]   Here, Mudrick Capital has adequately shown that (1) the produced documents do not allow it to adequately address the stated purposes, and (2) the produced documents also suggest that other documents exist, including emails, that address the crux of the stated purposes and are unavailable from another source.   Mudrick Capital has met its burden of showing that emails from January 1, 2017, to May 4, 2018, to or from Monroe, Ponder, and McIntyre[128]

---

[127]   *Yahoo!*, 132 A.3d at 790.  Defendant relies on three cases to argue that emails are not appropriate in a Section 220 demand: *In re UnitedHealth Grp., Inc. Section 220 Litig.*, 2018 WL 1110849 (Del. Ch. Feb. 28, 2018); *In re Plains All Am. Pipeline, L.P. Unitholders Books & Records Litig.*, 2017 WL 6016570 (Del. Ch. Aug. 8, 2017); and *Elow v. Express Scripts Hldg. Co.*, 2017 WL 2352151 (Del. Ch. May 31, 2017).  These cases do not support Defendant's argument.  None of those cases prohibit the production of emails in response to a Section 220 demand.  And if they did, they would be contrary to Delaware Supreme Court precedent (*see Wal-Mart Stores*, 95 A.3d 1264; *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113 (Del. 2002)), which this Court is bound to follow, that provides emails where plaintiffs show that emails are necessary to satisfy the stated purpose.  Here Plaintiff met that burden.

[128]   Monroe is the Executive Chairperson of the Board and Chief Executive Officer of Globalstar, PTO ¶ 33, and "Monroe's central role in the Merger is undisputed," Pl.'s Opening Br. 11 n.5; he is the controller of both Globalstar and Thermo, PTO ¶¶ 33, 34; and Special Committee minutes reference communications between him and the Special Committee members, Pl.'s Opening Br., Ex. 10, at 1.  Globalstar's 30(b)(6) representative stated in his deposition that Ponder is in possession of many of the requested documents.  JX 105, at 101-02.  McIntyre, in his role as Chair of the Special Committee, was involved in Merger negotiations.  *See* JX 014, at 1. Regarding Kneuer, Mudrick Capital provides only two reasons for requesting Kneuer's emails: (1) Kneuer was the only director to receive compensation in 2017,

27

are necessary "to effectively address the problem[s Mudrick Capital has identified], either through derivative litigation or through direct contact with the corporation's directors and/or stockholders."[129]

## B. Mudrick Capital Is Entitled to FiberLight Valuation Materials in Globalstar's Possession

Mudrick Capital has requested documents and communications transmitted or dated January 1, 2016, to May 4, 2018, relating to the valuation of FiberLight or the 2016 failed sale of FiberLight.[130] In 2016, FiberLight attempted an auction for $350-450 million.[131] Especially in the context of an interested transaction, purchasing a company for $1.245 billion when the company failed to garner $350 million two years earlier with no explanation of the new valuation provides a credible basis to investigate mismanagement, waste, or wrongdoing—a point which Globalstar does not dispute.

The value of the Merger assets, including FiberLight, and information regarding the process the Special Committee used to assign that value are necessary

---

and (2) Kneuer is a member of the Special Committee. Pl.'s Opening Br. 11 & n.5. Plaintiff has raised no issue regarding 2017 compensation, and Plaintiff offers no explanation for why Kneuer's emails are necessary in addition to the production of McIntyre's emails.

[129] *Saito*, 806 A.2d at 115.

[130] Pl.'s Reply Br. 25-27.

[131] JX 2, at 2.

and essential to "investigate possible breaches of fiduciary duty, mismanagement, corporate waste, and improper influence and conduct by members of . . . the Special Committee . . . with respect to the negotiation, execution, and approval of the . . . Merger Agreement."[132]  FiberLight is a privately held company.[133]  It is therefore difficult, if not impossible, for Mudrick Capital to obtain accurate valuation information for FiberLight.  Even if this was possible, external information would not explain how the Special Committee assigned a value of $1.245 billion to FiberLight.  Because this information is necessary to Mudrick Capital's stated, proper purpose, Globalstar must produce FiberLight valuation materials in its possession.

## C. Mudrick Capital Is Not Entitled to Draft Materials

### 1. Draft minutes

Mudrick Capital requests all drafts of Board and Special Committee minutes for January 1, 2017, to May 4, 2018.[134]  Mudrick Capital argues that the final minutes are "sanitized."[135]  Plaintiff supports this argument with two pieces of evidence:

---

[132]    JX 57, at 1 (purpose (i)).

[133]    Tr. 23:6.

[134]    Pl.'s Reply Br. 25-26.

[135]    Tr. 80:9-13.  Mudrick Capital also argues that Globalstar waived any objection to producing draft Board and Special Committee minutes by failing to respond to Plaintiff's arguments. Pl.'s Reply Br. 25-26. I disagree. Although Globalstar does not specifically argue in its Answering Brief that Mudrick Capital is not entitled to

29

(1) that Monroe told Mr. Mudrick that the Company expected litigation related to the Merger,[136] and (2) Globalstar's Corporate Secretary, Richard Roberts, is also Thermo's general counsel.[137]

Mudrick Capital provides no convincing explanation for why the draft minutes are any more or less "sanitized" than the final minutes. More importantly, however, Mudrick Capital simply has not shown that draft minutes are necessary in light of all the documents that have been and will be produced; thus, that demand is denied.

## 2.    Other draft materials

Mudrick Capital provides no convincing explanation for why Draft Materials outside of draft minutes are necessary to satisfy any of its stated purposes.[138]

---

draft minutes, Globalstar addresses Plaintiff's argument by asserting that Plaintiff needs no additional information generally. Def.'s Answering Br. 13 ("Mudrick needs no further information."); *id.* at 12-13 ("The [final] Board and Special Committee Minutes disclosed significant information . . . .").

[136]    Tr. 81:1-6.

[137]    Tr. 80:9-12.

[138]    *See* Pl.'s Opening Br. 43.

30

Because Mudrick Capital has not shown that these Draft Materials are necessary to one of the stated purposes, that demand is denied.[139]

## D. Globalstar Must Provide Privilege Logs

Globalstar must provide a privilege log that reflects documents withheld or redacted for any privilege for all productions, including past productions.[140]

## III. CONCLUSION

For the foregoing reasons, I find that Mudrick Capital is entitled to (1) emails and other communications related to Mudrick Capital's revised document requests and limited to custodians Monroe, Ponder, and McIntyre for the time period of January 1, 2017, to May 4, 2018, and (2) documents and communications related to the valuation of FiberLight and the 2016 failed sale of FiberLight for the time period of January 1, 2016, to May 4, 2018; Mudrick Capital is not entitled to Draft Materials; and Globalstar is required to produce a privilege log that reflects documents withheld or redacted for any privilege for all productions, including past productions. The parties shall submit an order consistent with this memorandum opinion within three business days.

**IT IS SO ORDERED**.

---

[139]  If Draft Materials were found to be necessary to one of the stated purposes, then I would be required to address privilege issues. That analysis is not required, and the parties have not adequately briefed these privilege issues.

[140]  *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 796 (Del. Ch. 2016).

31